EL PUEBLO DE PUERTO RICO, apelado, *v.* HÉCTOR LUIS MORALES RIVERA, acusado y apelante.

*Número:* CR-80-74      *Resuelto:* 31 de marzo de 1982

*Héctor A. Colón Cruz, Procurador General, y Ricardo Alegría Pons, Procurador General Auxiliar,* abogados de El Pueblo; *Rubén Castillo Marín,* abogado del acusado y apelante.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Procede la sentencia confirmatoria.

El proceso investigativo tendente a esclarecer e identificar exitosamente al autor de un crimen no es tarea fácil. Intervienen numerosos factores entre los cuales se destaca la disponibilidad de testigos oculares. Sobre éstos, el criterio cualitativo testimonial, a saber, la habilidad del deponente para *percibir* el acontecimiento, aptitud para *conservarlo* en su memoria, capacidad para *evocarlo*, modo de *querer* expresarlo, y *cómo* puede hacerlo, es esencial. El elemento tiempo resulta importante y, de ordinario, afecta estos factores. "Ingredientes adicionales tales como el grado de inteligencia del testigo, su facilidad o dificultad para verbalizar y explicar, el nerviosismo natural que genera la sala de un tribunal, las expectativas de una confrontación de lo atestado con el contrainterrogatorio, el interés en el desenlace final del caso y un sinnúmero de imponderables, imponen sobre los tribunales de instancia la más delicada función del quehacer judicial humano: el descubrir la verdad haciendo el mayor esfuerzo en dirimir prueba conflictiva y en muchas ocasiones incompleta." *García* v. *A.F.F.,* 103 D.P.R. 356, 357–358 (1975). Este proceso mental y realidad forense —que corresponde más bien a la disciplina de la psicología del testimonio— nunca puede ser ignorado por un tribunal. Su comprensión y aplicabilidad será en última instancia el elemento que inclinará de uno u otro lado la balanza de la justicia. Como veremos, el caso de autos no favorece la causa del apelante

Héctor L. Morales Rivera, en su impugnación de las sentencias dictadas por el Tribunal Superior, Sala de Mayagüez, por los delitos de asesinato en primer grado, tentativa de asesinato y dos infracciones al Art. 8 de la Ley de Armas. [1]

A los fines de evaluar los méritos de los errores discutidos es menester sintetizar la prueba creída por el jurado y el juez sentenciador.

El 12 de abril de 1978 los esposos Benito Cruz Justiniano y Ana M. Torres Vargas, vendedores ambulantes, tenían estacionada su guagua-negocio frente a la fábrica de atún de Mayagüez. Habían atendido a unos pocos parroquianos. Aproximadamente a la 1:30 p.m. se acercó un joven por el lado derecho del asiento delantero y le pidió a Benito un pantalón. Éste se bajó, fue a la parte posterior del vehículo, abrió la puerta trasera y tomó tres pantalones. Entonces se percató de que no le había preguntado al joven el tamaño del pantalón. Cuando va a virarse para inquirir tal dato "escucha que le dicen que se trata de un asalto" en cuyo momento recibe un disparo; cayó herido seriamente al piso y semi-inconsciente oyó tres más. Pudo observar "por unos segundos" a la persona que le disparó, que tenía una pistola con silenciador, usaba gorra estilo boina, tapándose la mayor parte de la frente, camisa azul tipo *banlon,* estaba bien recortado, era trigueño, de nariz perfilada, no tenía bigote, de aproximadamente 18 a 20 años, 5 pies con 6 ó 7 pulgadas de alto, y de 135 a 140 libras de peso. Su esposa, que estaba en el asiento del conductor pasando a una libreta los abonos del día, luego que su esposo se dirigió hacia atrás, oyó un ruido proveniente de esa posición y miró por el espejo retrovisor

---

[1] Respectivamente fue condenado a las penas de reclusión perpetua con trabajos forzados; de cinco (5) a diez (10) años de reclusión con trabajos forzados; y de tres (3) a cinco (5) años de reclusión con trabajos forzados en los otros dos casos. Dichas sentencias fueron consecutivas entre sí, con abono de cualquier prisión preventiva.

y vio un muchacho con un bate. Luego sintió que otro se acercaba, y encañonándola con una pistola le exigió "los chavos". Esa persona vestía mahón, calzaba *tennis*, usaba camisa *banlon* azul —sin cuello—, tenía un rostro de mujer en un tatuaje en el brazo derecho, se acababa de afeitar y recortar, labios gruesos, nariz regular, no muy perfilado y pelo rizo. Esta persona resultó ser el apelante Héctor L. Morales Rivera. Mientras ocurría este asalto pasó corriendo el guardia de seguridad de la atunera, persiguiendo al muchacho del bate en la mano —identificado como Rafael Castoire Sánchez— y Morales Rivera le disparó y el guardia cayó muerto. Seguidamente ambos muchachos y un tercero más joven no identificado escaparon y se montaron en un Volkswagen. Ningún policía entrevistó al matrimonio el día de los hechos. Cruz Justiniano estuvo en el hospital varios días. Subsiguientemente, los agentes Alexis Figueroa y Jacobo Ortiz visitaron su residencia para que identificara a los asaltantes por medio de fotografías y además, él y su esposa comparecieron al cuartel en varias ocasiones para observar detenidos. No identificaron a nadie ni ofrecieron descripción de los asaltantes. Sin embargo, se presentó en evidencia el informe suscrito por el policía Jorge Valentín. Consignó como "descripción de los individuos" recopilada a través del agente Montañez lo siguiente: (1) trigueño claro, pelo rizo negro, mediana estatura, de 22 a 25 años de edad; (2) trigueño claro, pelo rizo, nariz perfilada y *jacket* negro; y (3) un menor de 14 a 16 años, se desconoce esta descripción. La fecha de este informe: el día de los hechos, 12 de abril de 1978.

Así las cosas, la investigación policíaca permaneció inactiva hasta que para diciembre de 1979 —un año, ocho meses del asalto y asesinato— el agente Carlos A. Figueroa entrevistó al Sr. Diblain Irizarry, encargado de asilados de la Escuela Industrial de Mayagüez, con relación a otro caso y éste le informó que el apelante, para el año 1978 le

había confesado su participación en los sucesos de la atunera. Como consecuencia hizo gestiones para localizarlo y hacer una rueda de detenidos. No pudo. Localizó una ficha y retrato en el Cuartel General de San Juan y el 3 de marzo de 1980 visitó a los testigos Benito Cruz y Ana María Torres. En esta ocasión, incluida la fotografía recién obtenida, ambos sin reserva alguna y por separado identificaron la fotografía del apelante de entre aproximadamente 100 fotografías sueltas. Ese mismo agente preparó una composición de diez fotografías de personas de rasgos similares al apelante, e incluyó la de éste, y los esposos Cruz-Torres nuevamente lo identificaron. Se preparó la correspondiente acta de identificación el 11 de marzo de 1980 y prestaron ante el fiscal sendas declaraciones juradas. En éstas no aparece que se les preguntara la descripción del apelante. Solamente en la declaración de Benito se ofrece una descripción de un joven, de unos 20 años, trigueño, que usaba gorra. Se determinó causa probable en ausencia del apelante y luego de arrestado no se realizó rueda de confrontación. Los esposos Cruz-Torres lo identificaron en la vista preliminar y durante el juicio.

Los ocho (8) señalamientos de error del apelante se pueden agrupar en tres: (1) permitir al Ministerio Público incluir un testigo tardíamente y no suspender el juicio para investigarlo; (2) ilegalidad e inadmisibilidad de la identificación; y (3) inadmisibilidad de prueba sobre admisiones y error en instrucciones. A base de este esquema los evaluaremos.

■ Los planteamientos en torno al testigo de cargo adicional y la negativa del tribunal a quo en suspender la vista, se desvanecen ante la admisión del apelante de que "técnicamente el testigo fue anunciado a tiempo". La moción del Ministerio Fiscal fue suscrita y fechada el 17 de septiembre de 1980; y el señalamiento fue hecho para el 25. En este día se le entregó a la Defensa la declaración jurada del testigo y, accediendo a una solicitud, se ordenó a

la institución en que trabajaba —Escuela Industrial de Mayagüez— poner a disposición de la defensa para examen los récords de empleo y asistencia del testigo. Aun así la prueba de cargo no comenzó a desfilarse hasta el día 29. No hubo abuso de discreción judicial. *Valentín* v. *Torres*, 80 D.P.R. 463, 476 (1958).

Con referencia a la identificación del apelante tampoco se cometieron los errores. Veamos. Aduce que debió suprimirse la identificación de fotografías en la que se utilizó una foto obtenida cuando era menor de 18 años. Se refiere a la foto que localizó el agente Carlos Figueroa en el Cuartel General en San Juan. El apelante olvida que esta foto le fue tomada cuando fue arrestado el 17 de marzo de 1978 en San Juan en ocasión de haber sido acusado por otro delito, sobre el cual el Tribunal Tutelar de Menores *renunció su jurisdicción desde* el 21 de febrero de 1978. A partir de esa fecha estaba disponible su fotografía. Véase *Pueblo* v. *Domínguez Fraguada*, 105 D.P.R. 537 (1977). Es más, para el 21 de septiembre de 1978 el apelante se había declarado culpable en el Tribunal Superior, Sala de Adultos. Además, le aplicaría al apelante nuestra doctrina de *Pueblo* v. *Rey Marrero*, 109 D.P.R. 739, 741 (1980), en que resolvimos que "la identificación del imputado, hecha en el acto del juicio por testigos oculares de los hechos delictivos ventilándose, es admisible bajo las circunstancias aquí presentes, no empece que durante el curso de la investigación policíaca se utilizara, para fines de su identificación por dichos testigos, una fotografía tomádale al imputado sin su consentimiento y mientras permanecía detenido ilegalmente en un cuartel de policía".

Tampoco se cometió error en cuanto a la identificación por el método de fotografías. No están presentes factores negativos tales como sugestibilidad, falta de espontaneidad y carencia de confiabilidad. Véase *Pueblo* v. *Rosso Vázquez*, 105 D.P.R. 905 (1977); *Pueblo* v. *Toledo Barbosa*, 105 D.P.R. 290 (1976); *Pueblo* v. *Rivera Vázquez*, 102 D.P.R.

758 (1974). La prueba refleja que desde el punto de vista formal y procesal se siguió fielmente el trámite establecido en la Regla 252.2(b) de Procedimiento Criminal en cuanto a condiciones separadas, número de fotografías, rasgos similares, composición y acta. En el aspecto sustantivo se cumplieron satisfactoriamente los criterios enumerados como indicadores en *Pueblo* v. *Peterson Pietersz*, 107 D.P.R. 172 (1978), reafirmado en *Pueblo* v. *Rey Marrero*, supra. Veamos. (1) Dos testigos, los esposos Cruz-Torres tuvieron amplia oportunidad de observarlos en las siguientes condiciones favorables: era de día; ninguno de los asaltantes se cubrió el rostro; se acercaron y se expusieron plenamente a la vista de sus víctimas; (2) La señora Torres tuvo de frente y visible por tiempo suficiente al apelante, ya que éste le reclamó dinero —tenía que prestarle atención— antes de que ella se percatara de que su esposo estaba herido y ocurriera el incidente en que murió el guardia de seguridad. El señor Cruz, aunque no se fijó en el físico del primer muchacho que le pidió el pantalón, al virarse vio y observó por varios segundos a la persona que le disparó; (3) La fidelidad de la descripción de los asaltantes queda claramente expuesta en la Exposición Narrativa de la Prueba. Aunque ninguno de los testigos oculares los describió originalmente en declaraciones juradas, según hemos visto, el informe de la Policía realizado por el agente Valentín, *el día del suceso*, describe con bastante grado de fidelidad y exactitud las características físicas de los asaltantes, en particular la del apelante; (4) A la primera oportunidad en que les mostraron una foto del apelante, ambos testigos, separadamente, lo identificaron positivamente y sin lugar a dudas; (5) El transcurso de tiempo está presente y en apariencia afectaría la confiabilidad de la identificación. Sin embargo, el lapso de dos años entre la comisión del delito y la confrontación en lugar de debilitar la identificación la robustece. Nos explicamos. El apelante no demostró que a raíz de los

hechos se les mostrara a los testigos Cruz-Torres foto alguna de su persona. Su testimonio de que fue arrestado, fichado y fotografiado en Mayagüez para investigarlo no mereció crédito a los juzgadores. Adviértase que a los testigos oculares les mostraron originalmente muchas fotografías y ellos afirmativamente atestaron que la foto del apelante no estaba incluida. Tomamos conocimiento judicial de los miles de récords y fotografías acumulados por la Policía en el desempeño de sus labores. Por el contrario, su planteamiento en torno a la alegada legalidad de la fotografía establece que no es hasta diciembre de 1979 que el agente Figueroa localizó su fotografía en *San Juan*. Al mostrársela entonces a los testigos el 3 de marzo de 1980, lo identifican. Si alguna conclusión se puede derivar de lo expuesto es que la identificación es absolutamente confiable. Los testigos no pudieron antes reconocerlo porque no estaba su fotografía. Cuando ésta fue incluida lo hicieron.

■ En resumen, la totalidad de circunstancias descritas abonan la conclusión de que la identificación por fotografías fue correcta y ajustada en derecho.

Réstanos considerar los apuntamientos sobre la procedencia de las admisiones hechas por el apelante y la negativa a una instrucción en particular. Ambos están relacionados entre sí.

■ El primero no fue cometido. Era admisible el testimonio de Diblain Irizarry para demostrar que el apelante le había manifestado su participación en el asalto de la atunera. Ahora bien, erró el tribunal de instancia al negarse a transmitir al jurado la instrucción en el sentido de que "la regla establecida es que la convicción de un acusado tiene que descansar en algo más firme que una mera admisión o confesión no corroborada". *Pueblo* v. *Pérez Fernández*, 95 D.P.R. 919 (1968). La instrucción correcta sobre el tema debe ser:

Para que una admisión sea suficiente para concluir que el acusado es culpable del delito que se le imputa debe haber alguna otra prueba que corrobore la admisión con el delito que se le imputa pero no es necesario que la evidencia corroborativa por sí sola e independientemente de la admisión establezca el *corpus delicti;* ni la culpabilidad del acusado fuera de duda razonable; ni tiene que tener un carácter concluyente. Evidencia circunstancial puede ser suficiente corroboración y cuando hay alguna evidencia *aliunde* tendiente a establecer el *corpus delicti,* la admisión puede ser considerada en relación con esa evidencia para establecer el *corpus delicti.* Ver *Pueblo* v. *Pérez Fernández,* supra.

■ Sin embargo, el error no puede catalogarse como perjudicial. La prueba sobre la identificación satisface plenamente la función corroborativa que exige la doctrina. Y la veracidad de esta identificación y la participación del apelante en el crimen queda fortalecida con su inexplicable presencia en la ciudad de Mayagüez —residía en San Juan— para el día de los hechos.

El error sobre insuficiencia de la prueba elaborado por el apelante a base de la posición del vehículo y trayectoria de los proyectiles disparados es especulativo por la fragilidad de su base. Correctamente argumenta el Procurador General que en "lo relativo a la supuesta incongruencia en el testimonio de Ana María Torres Vargas, en torno al desenlace de los hechos, lo que se desprende es todo lo contrario: la reproducción detallada del incidente trágico. Nótese la concordancia entre la aseveración de la citada testigo al efecto de que al primer disparo al occiso Reynaldo Vélez Arroyo se le cayó el arma de las manos y que el acusado le hizo dos disparos más a aquél. [E.N.P., pág. 11], confróntese con el testimonio del Dr. Jesús Vega López, al efecto de que el occiso recibió una herida de bala en la mano derecha. Y que en total recibió tres heridas de entrada de bala". (E.N.P., págs. 25 y 27.)

No existe duda en nuestras conciencias, como tampoco la hubo en las del jurado y el juez sentenciador respecto a la culpabilidad del apelante.

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Dávila emitió opinión disidente a la cual se unen el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Irizarry Yunqué.

—O—

Opinión disidente del Juez Asociado Señor Dávila a la cual se une el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Irizarry Yunqué.

Disiento. La identificación del apelante no es confiable. No cumple con los indicadores de suficiencia y confiabilidad que el Tribunal adoptara en *Pueblo* v. *Peterson Pietersz*, 107 D.P.R. 172 (1978).

Los vendedores ambulantes Benito Cruz y Ana María Torres se encontraban estacionados frente a la atunera de Mayagüez el día 12 de abril de 1978 a eso de la 1:30 p.m. Se acercó un muchacho por el lado derecho del asiento delantero y le pidió unos pantalones. Benito fue a la parte posterior de la guagua. Oyó que dijeron: "éste es un asalto", se viró y recibió el impacto de una bala. Cayó al piso inconsciente. Ana María estaba en el asiento del conductor pasando una libreta de abonados, oyó un ruido en la parte posterior de la guagua momentos después de que su esposo se dirigiera en esa dirección. Miró por el espejo retrovisor, vio un muchacho con un bate y luego sintió que otro se acercó y le pidió los chavos. Mientras esto ocurría pasó corriendo el guardia de seguridad de la atunera, persiguiendo al muchacho del bate en la mano. El muchacho que estaba con ella disparó y el guardia cayó muerto. Seguidamente ambos muchachos escaparon y se montaron en un Volkswagen. Ningún policía entrevistó a los esposos Cruz-Torres el día de los hechos. Comparecieron al cuartel en varias ocasiones para observar detenidos. Agentes visitaron su residencia para que identificaran a los asaltantes por medio de fotografías. Nunca ofrecieron descripción de los asaltantes. Casi dos años más tarde de

ocurrido el asalto un agente del orden visitó al Sr. Diblain Irizarry, encargado de asilados de la Escuela Industrial de Mayagüez, con relación a otro caso, y en esa ocasión informó que para 1978 el aquí apelante le había confesado su participación en los sucesos de la atunera. El día 3 de marzo de 1980, posterior a recibir el informe del custodio de los retenidos en la Escuela Industrial de Mayagüez, el agente visitó a los testigos Benito Cruz y Ana María Torres. En esta ocasión los esposos identificaron, por separado, la fotografía del apelante. Varios días después, el 11 de marzo de 1980, prestaron ante el fiscal sendas declaraciones juradas. En éstas no aparece descripción alguna del apelante. La declaración de Benito describe meramente a un joven trigueño que usaba gorra.

En *Pueblo* v. *Peterson Pietersz*, supra, ratificado en *Pueblo* v. *Rey Marrero*, 109 D.P.R. 739 (1980), expusimos los criterios que deben usarse para determinar la confiabilidad de una identificación. Estos criterios son:

(a)  oportunidad de observación que tuvo el testigo,

(b)  el grado de atención que prestó durante los sucesos,

(c)  la fidelidad de la descripción y los detalles que ofreció al ser investigado,

(d)  nivel de certeza que demostró cuando identificó al sospechoso,

(e)  transcurso del tiempo entre la comisión del crimen y la confrontación posterior con el sospechoso.

El propósito de estos indicadores es examinar la confiabilidad de una identificación hecha cuando no se cumplió el procedimiento provisto por la Regla 252.2 de Procedimiento Criminal. Cuando no se usa la rueda de detenidos y el procedimiento utilizado pudo ser sugestivo, es imperativo que se evalúe la totalidad de las circunstancias para decidir si se violó el derecho al debido proceso de ley que tiene un acusado.

Procede, pues, evaluar los hechos antes expuestos a la luz de los criterios arriba mencionados:

A. *Oportunidad de observar que tuvo el testigo*

Benito tuvo escasa oportunidad de observar quién le disparó. Declaró que no se fijó en el rostro del apelante cuando se bajó de la guagua a buscar los pantalones. Sólo "observó" por fracción de segundo al que le disparó. Recibió el disparo al momento de voltearse.

Ana María observó un muchacho con un bate en la mano a través del espejo retrovisor. Luego se apareció otro, revólver en mano, que le pidió los chavos. Casi de inmediato ocurrió el disparo contra el guardia de seguridad. Declaró que transcurrió un período de tres minutos desde que el asaltante le pidió los chavos y se escapó corriendo de espaldas a ella hasta montarse en un Volkswagen.

B. *Grado de atención que prestó durante los sucesos*

Benito declaró que cuando se bajó del vehículo a buscar los pantalones no se fijó en el físico del muchacho. Oyó que dijeron esto es un asalto. Declaró que no sabe si la persona que dijo estas palabras fue la misma que disparó. Declaró que transcurrieron de diez a quince segundos desde que oyó la voz, se volteó y recibió el impacto de la bala. Por lo tanto, en el primer momento que tuvo contacto con quien le disparó, admitió que no prestó atención y en el segundo momento no tuvo oportunidad de prestar atención porque el contacto fue muy breve. Además, Benito declaró que no ve bien de cerca.

Al examinar el grado de atención que prestó Ana María, tenemos que considerar que cuando advino en contacto visual con quien vio disparar al guardia de seguridad, ya había ocurrido el incidente con su esposo en la parte posterior de la guagua. Es razonable presumir que se encontraba muy nerviosa. Así lo admitió cuando declaró que la llevaron a recuperarse a la enfermería de la

atunera. Además, estando sentada dentro de la guagua, su atención tuvo que dirigirse a buscar los chavos que le pedían y seguidamente se desvió a mirar el incidente entre el guardia de seguridad y el otro muchacho que llevaba el palo en la mano. No podemos concluir de los hechos narrados, que Ana María prestó un alto grado de atención en estas circunstancias.

C. *Fidelidad de la descripción y los detalles que ofreció al ser investigado*

Es interesante notar el hecho de que, siendo Ana María la que tuvo más tiempo de observar, no ofreció ninguna descripción del asaltante. No consta en evidencia ningún informe que ofreciera al respecto; esto, a pesar de haber visitado el Cuartel de la Policía de Mayagüez y a pesar de que los agentes visitaran su casa. No es hasta que los agentes visitan su casa el 3 de marzo de 1980, dos años después de los hechos, que ella ofreció una descripción. Sin embargo, cuando ofreció la declaración jurada ante el fiscal, el 11 de marzo de 1980, tampoco ofreció descripción.

La descripción que ofreció Benito, la cual tampoco ocurre producto de una investigación a raíz de los hechos, es extremadamente vaga. En la declaración jurada que ofreció al fiscal el 11 de marzo de 1980 describe al que le disparó como un muchacho joven, trigueño, que usaba gorra.

Ninguno de los dos testigos ofreció detalles que nos animen a pensar que la identificación es confiable. No informaron ni con un mínimo de precisión detalles sobre forma y color de pelo, ojos, nariz, boca, tez. Tampoco se mencionó estatura ni rasgos peculiares. No es hasta dos años más tarde, cuando el agente visitó la residencia de los testigos, que ofrecieron descripción. El agente declaró que entonces le ofrecieron ciertos detalles.

D. *Nivel de certeza que demostró al identificar al sospechoso*

Ambos testigos identificaron separadamente la misma fotografía del hoy apelante. Los testigos habían visitado el

cuartel y en muchas ocasiones para observar detenidos y ver fotografías de sospechosos. Sabemos que la fotografía del coacusado Rafael Castoire Sánchez se encontraba en los archivos de la Policía de Mayagüez. No sabemos si a raíz de los hechos esta fotografía les fue mostrada a los testigos. Este hecho crea duda razonable sobre si dicha fotografía les fue mostrada a los testigos y no identificaron al coacusado entonces. En adición, el apelante declaró que posterior a los sucesos de la atunera lo arrestaron junto al coacusado en Mayagüez para investigarlo. El agente que efectuó el arresto declaró corroborando el hecho. El apelante declaró que en esa ocasión fue fotografiado, fichado e interrogado sobre los sucesos en la atunera. El agente declaró que no recordaba si fue fotografiado o fichado. Una vez más se crea la duda de si efectivamente la fotografía del apelante fue mostrada a los testigos a raíz de los hechos y éstos ciertamente no lo identificaron entonces.

E. *Transcurso del tiempo entre la comisión del delito y la confrontación posterior*

Transcurrieron casi justamente dos años entre los hechos imputados y la identificación por medio de fotografía. Normalmente el transcurso de dos años borra fácilmente imágenes que en un instante fueron percibidas y no hicieron huella en la memoria, tanto por lo breve de la percepción como por el estado de ánimo en que se percibieron.

Evaluados los criterios enunciados para determinar si la identificación de los acusados fue confiable o no, es inescapable que no lo fue. Los testigos tuvieron poca oportunidad de observar a los asaltantes; el grado de atención, fidelidad y certeza de la descripción son cuestionables y transcurrió un período considerablemente largo para que se mantuvieran en la memoria unos rostros que no se pudieron observar bien por la brevedad y condiciones del encuentro. Dentro de la totalidad de las circunstancias

antes descritas, la identificación hecha en este caso conlleva la negación del debido proceso de ley. La identificación hecha en el tribunal es inadmisible por no estar basada en un recuerdo independiente. Estuvo basada en el proceso de identificación de la fotografía. La sugestividad permeó este proceso y, por lo tanto, la convirtió en una identificación ilegal. La identificación hecha en el acto del juicio estuvo maculada por la anterior y debe ser excluida. *Pueblo* v. *Rey Marrero*, supra y casos allí citados.