EL PUEBLO DE PUERTO RICO, apelado, *v.* MANUEL RIVERA NAVARRO, acusado y apelante.

*Número:* CR-80-88    *Resuelto:* 7 de diciembre de 1982

---

*Margarita Carrillo,* de la Sociedad para Asistencia Legal, abogada del apelante; *Miguel Pagán, Procurador General Interino,* y *Josefa A. Román García, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Manuel Rivera Navarro impugna las convicciones por asesinato en primer grado, robo y dos violaciones a los Arts. 8 y 6 de la Ley de Armas. Ninguno de sus señalamientos constituye fundamento para invalidar las sentencias dictadas.(¹) Examinémoslos.

## I

El primero cuestiona la negativa del tribunal de instancia a suspender la vista. Aduce que ello le privó de su derecho a una adecuada representación de abogado, pues el que lo asistió no tuvo suficiente tiempo para prepararse.

■ El señalamiento es frívolo, producto más bien de una concepción errónea de que los derechos que amparan a todo acusado son irrestrictos y absolutos. Reafirmamos que "[s]ancionar lo que aquí repudiamos equivaldría a establecer un precedente en extremo perjudicial para la ordenada administración de justicia en la esfera de lo penal. *Tendría el efecto de concederle a los inculpados el dominio sobre los calendarios de las cortes, colocándoles en condiciones de resolver cuándo han de ventilarse los procesos, proporcionándoles fácil medio para lograr la posposición de las vistas a su antojo, con simplemente aguardar hasta el último instante para designar o cambiar abogado." Romero* v. *Jones, Alcaide*, 78 D.P.R. 572, 577-578 (1955). (Énfasis suplido.)

Desde el 4 de noviembre de 1979 —día de los hechos y también de la denuncia— hasta que comenzó el juicio el 12 de noviembre de 1980, transcurrieron exactamente 373 días (un (1) año y 8 días). Durante ese período el caso fue suspendido en seis (6) ocasiones. El Ministerio Fiscal siempre estuvo preparado. Dos suspensiones se debieron al tribunal, por estar ventilando otros asuntos, y las restantes a la defensa. Desde el mismo día de la denuncia, durante la

---

(¹) Reclusión perpetua por el asesinato en primer grado; de cinco (5) a diez (10) años por el robo; de dos (2) a cuatro (4) años, y seis meses, respectivamente en cada caso por los Arts. 8 y 6 de la Ley de Armas.

rueda de detenidos, la vista preliminar, la lectura y todos los señalamientos, excepto uno, el acusado estuvo asistido del Lcdo. Fernando Iglesias.

El primero se suspendió a petición y por razón de que el licenciado Iglesias estaba evaluando una defensa de coartada. Después de eso, al licenciado Iglesias se une el licenciado Miranda Cestero. Siguen las suspensiones, y para el 2 de octubre de 1980 —fecha de la última— el Lcdo. Enrique Miranda Cestero estaba recluido de emergencia en el hospital por una afección cardíaca.(2) En esa ocasión el juez, sobre la objeción del Ministerio Fiscal, transfirió la vista para el miércoles 12 de noviembre del mismo año, con carácter de último señalamiento. En términos enérgicos, apercibió a las partes. Ese día se intenta suspender el juicio nuevamente, puesto que el licenciado Miranda Cestero continuaba enfermo. Interviene a tales efectos el Lcdo. Teodoro Meléndez Lebrón. El tribunal correctamente se negó y pospuso la vista para horas de la tarde. Se empezó el proceso de selección de jurado y no fue hasta cinco (5) días después, el lunes 17, que propiamente el Ministerio Público comenzó a desfilar su prueba.

En estas circunstancias, ¿de qué se queja el apelante? *Primero.* Ningún acusado tiene el derecho a mantener interrumpido el sistema de administrar justicia, mediante la designación de determinado abogado. Ese derecho y su particular preferencia de aquel seleccionado no es absoluto ni ilimitado, depende de la disponibilidad del abogado. Puede quedar afectado por circunstancias particulares —bien sean profesionales o personales— tales como conflicto de señalamiento, exceso de trabajo, condición de enfermedad recurrente y otras circunstancias análogas. Nace, vive y muere a base del criterio de razonabilidad. Lo contrario sería desarticular el sistema judicial. "El derecho

---

(2) La legitimidad de esta condición física no se cuestiona. Nuestros pronunciamientos no la desvirtúan.

a asistencia de abogado no quiere decir el derecho a la asistencia de un abogado en particular[,] sino de un abogado admitido a ejercer en los tribunales, de la libre selección del acusado cuando esto es factible y en su defecto, de un defensor público o del que le provea el tribunal, y que en el caso particular de que se trate haga una defensa *bona fide* y no meramente *pro forma.*" *Pueblo* v. *Pardo Toro*, 90 D.P.R. 635, 649 (1964). *Segundo*, no es procesal como tampoco en sus méritos la defensa fue pro forma. Participó uno de sus abogados: el licenciado Iglesias, quien conocía todo el trámite y las posibles defensas. Desde sus inicios obtuvo la primera suspensión fundada en un estudio de la defensa de coartada. Es curioso que nunca la planteara formalmente, aunque —sin explicación en los autos— desfiló prueba que en lo esencial era a tales efectos. Véase: *Pueblo* v. *Millán Meléndez*, 110 D.P.R. 171, 182–183 (1980). Es interesante recordar que el apelante declaró que no estaba en el lugar y que recibió la herida de bala de unos disparos originados en un automóvil desconocido. Ese testimonio no mereció crédito a los juzgadores de instancia. Sin embargo, lo prestó con el propósito exculpatorio y bajo la hipótesis de que era veraz. Preguntamos, ¿en qué consistió la representación inadecuada?, ¿qué otra defensa era factible y viable? *Tercero* y último, el costo social que representa cada suspensión y que como máximo el sistema está dispuesto a tolerar, había excedido sus límites: comparecencia, estabilidad económica y seriedad de los señalamientos, impacto económico, público y privado, sobre protagonistas, funcionarios, testigos y otros. El juicio rápido no es derecho que pertenezca privativamente a un acusado. *García* v. *Tribunal Superior*, 104 D.P.R. 27 (1975).

Irónicamente, para algunos acusados el propiciar suspensiones "adelanta" sus causas, pues contribuye al deterioro de la evidencia por la indisponibilidad de testigos —ausencia, desaparición o muerte— y pérdida de la memoria sobre hechos esenciales. Estudios en varias jurisdiccio-

nes demuestran que, por regla general, no les interesa ventilar sus casos con prontitud. Puerto Rico no es la excepción. Esta actitud forma parte de la sicología, naturaleza y conducta humana inherentes a la dinámica procesal. Choca con el ideal constitucional de un "juicio rápido". Al protagonista del esquema forense penal le resulta ventajoso controlar indirectamente el momento en que se ventile el caso en su fondo.

Repetimos, cada suspensión conlleva unos desembolsos que no sólo gravan la rama judicial, sino a los demás componentes principales e incidentales del sistema: policía, fiscales, asistencia legal y ciudadanía en general. Implica gastos relacionados con los trámites y documentos ordinarios, citación, pago de dietas y otros. Los testigos experimentan gastos en transportación, pérdida de ingresos que no son compensables mediante las módicas dietas y sufren distintos tipos de inconveniencias. Sobre todo, afecta y debilita la confianza en la administración de la justicia y fomenta un sentido de injusticia, inseguridad e incertidumbre por la tardanza en la determinación final fáctica y jurídica de la controversia.

## II

Concentremos nuestra atención en los planteamientos sobre la identificación realizada en la rueda de detenidos. Alega violación al debido proceso de ley (Regla 252.1(e)(2) de Procedimiento Criminal, 34 L.P.R.A. Ap. II) al: (1) informarse a los testigos que se había detenido "un sospechoso"; (2) no levantarse un acta *negativa* en torno a los testigos que no pudieron identificarlo; y (3) que su identificación fue poco confiable.

A los fines de evaluar éste y los restantes errores, resumamos la prueba.

En esencia, la del Ministerio Fiscal, creída por el jurado y tribunal *a quo*, demostró que el 4 de noviembre de 1979, aproximadamente a la 1:15 a.m., el negocio-bar denominado

"El Carrillón", ubicado en Río Piedras, fue asaltado por dos individuos. Éstos, antes de perpetrar sus delitos habían intentado entrar al mismo como clientes, pero por instrucciones de su propietaria, la Sra. Lourdes López Rivera, no se les abrió. En esa ocasión, a través de la puerta de cristal, ella pudo observarlos. Con posterioridad, es un hecho que por lamentable ingenuidad(3) uno de los parroquianos les abrió la puerta y entraron. Una vez dentro pidieron cerveza y la señora López se la despachó. Uno de ellos, identificado posteriormente como el acusado apelante Rivera Navarro, preguntó por el baño y se dirigió hacia allá. Cuando regresó, cogió por el cuello a la señora López y anunció que se trataba de un asalto. En unión a su cómplice, blandió armas y ordenó a todos tirarse al suelo y abstenerse de observarlos. Durante el asalto uno de los clientes llamado Pedro A. Deliz Durán, reaccionando contra la agresión de una patada que infirió Rivera Navarro a la señora López, logró sacar su revólver, y antes de que fuera muerto lo hirió. El análisis toxicológico durante la autopsia reveló 0.21% por peso de alcohol en la sangre, equivalente "a 10 latas de cerveza de 12 onzas" o "10 onzas de ron" (E.N.P., pág. 10). La evidencia también refleja que la iluminación del local era bastante clara, pues se acostumbraba jugar dominó y que esa noche se culminaba el festejo de un cumpleaños de una de las parroquianas, que había comenzado en el "Bar El Mono". Momentos antes del fatal incidente estaban leyendo poesías. Los asaltantes escaparon. Las personas allí presentes suministraron a la Policía las descripciones que mejor pudieron brindar y ésta notificó al Centro de Mando esa descripción. Fueron citados al Cuartel General.

En dicho lugar, a las 9:00 a.m., fueron llevados ante una rueda de detenidos para ver si podían identificar un sospechoso. Entre los cinco (5) integrantes de la rueda estaba el apelante Rivera Navarro, quien había sido detenido con

---

(3) El cliente que les abrió "les dijo que no les querían abrir porque los creían asaltantes". (E.N.P., pág. 5.)

anterioridad por la Policía de Carolina cuando fue a recibir tratamiento al Centro Médico de una herida de bala que recibió en el bíceps del brazo izquierdo.

En la rueda sólo la empleada Migdalia Lozada Rosado lo identificó positivamente. La Sra. Lourdes López Rivera lo hizo con posterioridad cuando lo vio en una celda. Según su testimonio, se encontraba antes muy nerviosa. Antes de la rueda de detenidos el apelante estuvo asistido del Lic. Fernando Iglesias. La Policía sólo levantó acta de la rueda de detenidos en cuanto a la identificación positiva. No levantó acta *negativa* respecto a los otros testigos participantes por ser del criterio de que ello no era necesario y por no exigirlo la ley.

Por su parte, la teoría y prueba desfilada del apelante no cuestionó ni negó los hechos acaecidos dentro del negocio en la madrugada del 4 de noviembre. Estuvo dirigida a demostrar que no era la persona descrita como el asaltante y que fue herido *en otro lugar* por unos disparos que le hicieron unos desconocidos desde un automóvil mientras se dirigía a su casa esa noche.

■ Teóricamente y según concluyó el propio foro primario, se cometió un error al comunicar a los testigos que se iba a efectuar una rueda de detenidos: "a ver si podían identificar *a una persona sospechosa*" y "porque tenían un sospechoso" (E.N.P., págs. 2, 6). Sin embargo, el error no implica sugestividad ni le resta confiabilidad al proceso de identificación. Aunque la Regla 252.1(e)(2) concretamente dispone que "[n]o se le [*sic*] informará a los testigos antes de la celebración de la rueda que se tiene detenido a un sospechoso", resulta evidente que se trata de un requisito de difícil y casi imposible cumplimiento, pues ¿de qué modo, forma o lenguaje puede requerirse a unas personas —los presuntos testigos— de la naturaleza y el tipo de acto que se pretende realizar? ¿Cómo explicar a la ciudadanía y a los testigos la necesidad de su intervención? ¿Cómo evitar transmitir, expresa o implícitamente, que existe una per-

sona sospechosa si precisamente de eso se trata? En algún momento o etapa, por obligación, habrá que pedirles al menos que se trasladen uno por uno al lugar de observación y habrá que comunicarles que observen a los integrantes de la rueda de detenidos, para ver si pueden identificar a alguno. No existe, pues, lógica en la gramática de esta disposición. Es necesario ir más allá. La propia Regla 252 de Procedimiento Criminal, su título y trámites están apuntalados en la premisa de que existe un sospechoso, pues de lo contrario, ¿para qué celebrarla?

■ Concluimos que la prohibición establecida en la Regla 252.1(e)(2) trasciende su literalidad. Debe leerse en unión al inciso (7), que proscribe que, expresamente o de cualquier modo, se influya o sugiera adrede la selección de alguna persona específica en la rueda. *Informe Comisión para el Estudio de la Policía*, Consejo sobre la Reforma de la Justicia (1974), pág. 156. El hecho de comunicar simplemente —como en el caso de autos— que se va a celebrar la rueda, pues hay un sospechoso, sin ninguna otra particularidad, indicación o sugerencia en cuanto a su identificación, no viola el debido proceso de ley.

El apelante discute que no se preparó el acta de identificación *negativa* en cuanto a los testigos que no lo identificaron. Aduce que le impidió presentar prueba exculpatoria durante el juicio.

■ Aunque la Regla 252.1 no exige expresamente que se levante un acta negativa, su inciso (f), mediante el mandato legislativo, permite llegar a esa interpretación. Reza:

> *Récord de los procedimientos. En todo procedimiento efectuado de acuerdo a [sic] estas reglas se levantará una breve acta la cual será preparada por el encargado de la rueda.*
> En dicha acta se incluirá el nombre de los integrantes de la rueda, nombres de otras personas presentes y *un resumen [sucinto] de los procedimientos observados.*
> Deberá además tomarse cuantas veces fuere necesario para su claridad una fotografía de la rueda tal y como le fue presentada a los testigos. Dicha foto, al igual que el acta levan-

tada, formará parte del expediente policíaco o fiscal correspondiente y su obtención por un acusado se regirá por las reglas de procedimiento criminal vigentes. (Énfasis suplido.)

Aparte de aspirar a la uniformidad, la preparación de esa breve acta en todo procedimiento —sea positiva o no la identificación— sería otra garantía más de que la Policía ha cumplido satisfactoriamente los requisitos germanos dirigidos a salvaguardar la confiabilidad en el proceso de identificación penal. Sin embargo, su inobservancia no significa que automáticamente todo el proceso está viciado. Lo crucial será la determinación judicial de si la identificación fue sugestiva. Claro está, al Ministerio Público se le dificultará demostrar la ausencia de sugestividad en aquellas situaciones en que la Policía prescinde, inexplicable e injustificadamente, de algunos de los requisitos de la regla.

En este caso, el que la Policía no levantara un acta negativa no fue perjudicial. Primeramente, la prueba tiende a indicar que esa omisión se debió a un criterio *bona fide* del agente Ángel R. Soto Rivera de que no era necesario. Segundo, el fiel cumplimiento de los demás requisitos tiende a confirmar la ausencia de un intento directo o indirecto de la Policía para influenciar o sugerir adrede a los testigos una identificación. A tales efectos se destaca la fotografía de la rueda de detenidos. Su examen revela al apelante en unión a otras cuatro (4) personas de características físicas y vestimenta afines. Más aún, no se desprende indicio de que fuera herido en el brazo. Con tal propósito se le permitió que sus familiares le trajeran ropa y se cambiara, pues la que tenía estaba ensangrentada. Y tercero, el acusado, a través de la prueba del Ministerio Fiscal —acta positiva y demás testimonios— estableció todas las circunstancias que rodearon el proceso de identificación. Salvo los señalamientos inconsecuentes que nos hace, el procedimiento fue correcto.

■ Apreciados en su verdadero alcance, a la luz de la totalidad de las circunstancias que rodearon el procedi-

miento, concluimos que la identificación fue confiable. *Pueblo* v. *Morales Rivera,* 112 D.P.R. 463 (1982); *Pueblo* v. *Rey Marrero,* 109 D.P.R. 739 (1978); *Pueblo* v. *Rosso Vázquez,* 105 D.P.R. 905 (1972); *Pueblo* v. *Gómez Incera,* 97 D.P.R. 249 (1969). Así la testigo Lozada Rosado tuvo amplia oportunidad de observar al apelante; ni éste ni su cómplice estaban enmascarados; el negocio estaba adecuadamente iluminado; el tiempo de exposición de varios minutos fue más que suficiente; la conducta de los asaltantes, exigencias y demás incidentes requirieron un grado razonable de atención de la testigo; ella demostró fidelidad al describirlos, en la primera oportunidad; no tuvo duda alguna al ser confrontada; y transcurrieron apenas unas horas entre la observación y esa confrontación.

Finalmente, la certeza y confiabilidad de esta identificación no se debilita porque las otras personas presentes en el negocio no pudieron identificar al apelante en la rueda de detenidos. En cierto sentido la robustece. La prueba revela que a la avanzada hora en que se consumó crimen (1:15 de la madrugada) estas personas habían ingerido y estaban bajo los efectos de bebidas alcohólicas: "estaban picaos", no "borrachos" (E.N.P., pág. 3). La víctima Deliz Durán tenía 0.21% de alcohol en la sangre. Tomamos conocimiento judicial de que los efectos del alcohol reducen el grado de percepción, concentración, agilidad mental y destreza motora. A mayor consumo, menos habilidad. Ello tiende a ilustrar la inhabilidad de quienes estaban "picaos" para identificar. Esto explica porqué sólo las testigos Lozada Rosado y López Rivera, empleada y dueña que *no* bebieron (E.N.P., pág. 3), fueron las que en primera y segunda oportunidad lo identificaron.

### III

El tercer error trata sobre un comentario del Ministerio Fiscal en cuanto al silencio del acusado al aquél preguntar a un testigo de cargo si éste solicitó la prueba de

parafina cuando estaba detenido en el Cuartel General. Insiste en que el tribunal de instancia debió disolver el jurado.

El incidente propiamente se originó como consecuencia de la defensa haber preguntado al agente Francisco Aponte, durante su contrainterrogatorio, sobre la investigación del caso y éste haberle contestado que no hizo la prueba de parafina al acusado. (E.N.P., pág. 8.) Después, en el redirecto del agente Ángel R. Soto Rivera, el Ministerio Público le preguntó "si el acusado o su abogado pidieron que se le hiciera la prueba de parafina". (E.N.P., pág. 9.) La defensa objetó y en ausencia del jurado solicitó sin éxito su disolución. El tribunal de instancia aceptó que era un error del fiscal e inmediatamente, al regresar el jurado, instruyó que la pregunta era "improcedente, porque el acusado no tiene que probar nada, ni declarar nada, no tiene que ofrecer prueba de defensa". Explicó, además, que al acusado se le presumía inocente y que no deberían dejarse influir por la posible contestación. (E.N.P., págs. 9–10.)

Las oportunas instrucciones del juez salvaron cualquier posible perjuicio. El comentario fue uno limitado, en forma indirecta, a una sola pregunta. Como cuestión de hecho, independientemente de la misma, la prueba, en esa etapa ya había establecido que la Policía no le había hecho la prueba de la parafina, y por inferencia, el jurado conocía ese dato. Al analizar posteriormente el testimonio del apelante, se corroboró que en efecto éste no había solicitado esa prueba.

## IV

El último error discutido es que no se estableció la culpabilidad del apelante más allá de duda razonable. Está predicado en la tesis de que su identificación estuvo viciada, fue sugerida y adolecía de falta de confiabilidad. Hemos dispuesto de estos señalamientos previamente. La prueba fue suficiente para superar al *quantum* constitucional de demostrar su culpabilidad más allá de toda duda razonable.

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Rebollo López concurre en el resultado sin opinión.