EL PUEBLO DE PUERTO RICO, apelado, *v.* FRANCISCO RIVERA TIRADO, acusado y peticionario.

*Número:* CR-84-30          *Resuelto:* 13 de junio de 1986

420

422

*Erick E. Kolthoff Benners,* abogado del apelante; *Américo Serra, Procurador General Interino, Lirio Bernal de González, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

En su aspecto decisorio, el presente recurso pone de manifiesto que "nada, ni siquiera la rica experiencia y la viva intuición, podrían relevar del método en una materia donde se trata ante todo de proceder con seguridad. La prudencia metódica es madre de la sabiduría en la busca de la justicia humana". F. Gorphe, *Las Resoluciones Judiciales* (L. Alcalá-

Zamora, trad.), Buenos Aires, Eds. Jur. Europa-América, 1953, pág. 165.

En sus hechos, refleja un esquema de conducta, sencillo pero ingenioso, revestido en ocasiones de algunos visos de legalidad, concebido con el propósito de defraudar una instrumentalidad gubernamental. Como tal, es un mal que corroe las fibras íntimas de una honesta gestión pública y va en detrimento de la sana administración gubernamental y de la fe que presupone toda encomienda de este género en cualquier escala jerárquica.

## I

La Puerto Rico Marine Management (Navieras) tenía como costumbre del negocio rematar todo equipo que resultara obsoleto para sus operaciones. Con ese propósito colocaba cada *trailer*, vagón, chasis o equipo así clasificado en una lista de "propiedad fuera de servicio". El Departamento de Compras vendía el equipo al comprador y le expedía un recibo de compra titulado *Bill of Sale* firmado por su director.

Las únicas personas autorizadas a negociar y vender equipo así clasificado eran Glenn Mathers, Director del Departamento de Compras y, en su ausencia, su asistente Willy Ramos. El gerente del Departamento de Control de Equipo, Willie Merced Hernández, tenía a su cargo mostrar el equipo y dar información pertinente sobre los detalles de aquel incluido en la lista de propiedad fuera de servicio. No estaba autorizado a venderlo. Para la fecha de los hechos, Francisco Rivera Tirado trabajaba como *Dispatcher Clerk* bajo la supervisión de Merced Hernández. Rivera Tirado tampoco estaba autorizado a vender ni cobrar por ese equipo.

Entre las personas que hacían negocio con Navieras figuraba Luis Herrero. Éste compraba lotes de equipo para luego revenderlos. En ocasiones, aduce el apelante, Merced Hernández actuaba como agente de Herrero en la venta de equipo que éste le había comprado a Navieras. Dicha práctica sin em-

bargo fue descontinuada al enterarse Navieras que Herrero estaba vendiendo el equipo en los predios de la compañía antes de retirarlo e inclusive, a veces, antes de pagar por el mismo.

Un día, un tercero nombrado Luis Pellot acudió a Navieras a comprar furgones. Acordó comprar cincuenta (50) furgones puestos fuera de servicio a $600 cada uno. El negocio fue aprobado por el señor Mathers. Sin embargo se encontró con Herrero y éste, enterado del motivo de la visita de Pellot, le ofreció mejor precio por los furgones. Los examinó y seleccionó cuarenta (40) unidades. Pellot le hizo varias compras a Herrero pero tuvo problemas porque el "finguero" de Navieras no estaba disponible y no había plataforma donde enganchar los furgones. En eso, el "troquero" de Pellot, Edwin Soto Pérez, le informó a Pellot que el problema estaba resuelto porque tenía un "contacto" en Navieras que evitaba todo tipo de contratiempo.

Entonces comenzaron a comprarle furgones al "contacto", quien resultó ser Rivera Tirado. Éste les mostraba los furgones al comprador (Pellot o su "troquero"), el comprador identificaba los que interesaba comprar y entonces se los pagaba en efectivo. Rivera Tirado no le expedía recibo de venta (*bill of sale*) pero le entregaba un documento que le permitía al comprador retirar el furgón de los predios de Navieras.

Un día uno de los clientes de Pellot, a quien éste le había revendido uno de los furgones comprados a Rivera Tirado, acudió a Navieras a buscar el título de propiedad del furgón. No lo pudo obtener pues el furgón no aparecía como vendido en los datos de la computadora de Navieras. De inmediato comenzó la investigación que dio origen a las acusaciones contra Rivera Tirado.

Iniciada la investigación, pero antes de presentarse las denuncias en el caso, Navieras recibió una remesa (*invoice*) con ciertos cheques para pagar algunos de los "vanes" objeto de la investigación. Rehusó aceptar esos pagos pues se trataba de furgones que no había vendido. La prueba estableció que

fueron cheques o giros comprados por Merced Hernández a nombre de terceras personas, una de las cuales ni siquiera sabía que se estaba utilizando su nombre en dicho asunto.

Se acusó a Rivera Tirado por varios delitos de apropiación ilegal agravada. Ante tribunal de derecho fue declarado culpable y sentenciado. Apeló.

## II

En tres de sus señalamientos el apelante Rivera Tirado argumenta que los hechos presentados no demuestran que hubiese cometido el delito de apropiación ilegal agravada como tampoco que fuera culpable más allá de duda razonable. Invoca el *principio de legalidad* como impedimento para el castigo por conducta no tipificada como delito.

El Art. 165 del Código Penal dispone que será culpable del delito de apropiación ilegal "toda persona que ilegalmente se apropiare sin violencia ni intimidación de bienes muebles pertenecientes a otra persona". 33 L.P.R.A. sec. 4271. Según el Art. 166, apropiación se considera agravada cuando los bienes apropiados pertenecen a alguna entidad gubernamental. 33 L.P.R.A. sec. 4272. Por su parte, el Art. 8 prohíbe la acción penal por conducta no tipificada. 33 L.P.R.A. sec. 3031. Por ende si los hechos establecidos en el caso de autos no estuvieran cubiertos por alguna disposición penal del código, se impondría la exoneración del apelante Rivera Tirado.

La lectura de la exposición narrativa de la prueba, según antes reseñada, nos mueve a concluir que la misma estableció indubitadamente que el apelante Rivera Tirado se dedicaba a vender los furgones de Navieras para su propio beneficio. Ante ese hecho, no es necesario considerar si tenía la intención de restituir *aplazadamente* el costo de los furgones a Navieras, pues, después de todo, carecía de autorización para realizar esa gestión. Para escapar de las disposiciones del Código Penal, el apelante trató de demostrar que vendió los furgones por autorización de su supervisor directo, Merced Her-

nández, a quien le entregaba el dinero, y que estas ventas correspondían a equipo vendido a Herrero, a quien Navieras en ocasiones le había permitido pagar aplazadamente. Basó su teoría en los testimonios de Herrero y de Merced Hernández y en la circunstancia de que los furgones "vendidos" aparecían en la lista de equipo puesto fuera de servicio y disponible para la venta.

La dificultad de esta propuesta es que el tribunal sentenciador, en su función primordial de aquilatar la prueba, creyó la prueba del Ministerio Fiscal. Al dirimir credibilidad, tuvo que percatarse de la prueba documental consistente en la declaración jurada de James V. Ryan ante el fiscal (*Exhibit* IV Pueblo, sin objeción). Ello estableció que en la etapa investigativa del caso, Herrero negó que el apelante Rivera Tirado fuese su agente y además declaró que antes de entrevistarse con el investigador Ramiro Agosto de Navieras, Merced Hernández le solicitó a Herrero que declarase que lo había autorizado a vender los furgones de Herrero actuando como su agente.

El otro argumento del apelante descansa en la premisa de que el equipo vendido aparecía disponible para la venta en el listado de Navieras. No nos convence. Asumiendo que Navieras hubiese autorizado a Merced Hernández para que, en ausencia del funcionario a cargo de las ventas, *negociara* la venta del equipo, ello no constituía una autorización para que el apelante Rivera Tirado u otra persona vendieran y cobraran la propiedad con el solo propósito de personalmente realizar una ganancia en el negocio. No estaba autorizado a cobrar ni a expedir recibos de compra (*bill of sale*). Esta realidad quedó firmemente establecida en la prueba.

█ La conducta del apelante Rivera Tirado está claramente tipificada en el delito de apropiación ilegal agravada. Como resolviéramos en *Pueblo* v. *Uriel Álvarez*, 112 D.P.R. 312, 316–317 (1982):

En resumen, la metodología observada en el nuevo Código Penal agrupa una gama de conducta delictiva que, como elemento común, conlleva la transferencia temporal o permanente y voluntaria apropiación de una propiedad mueble, sin mediar consentimiento, obtenida por ardid, fraude, simulación, trama, treta "o mediante cualquier forma de engaño" a la víctima. En afán de cumplir con el principio de legalidad, el legislador ha intentado desafiar la imaginación del delincuente, y salir victorioso haciendo una fórmula en síntesis, de las especies típicas y modalidades de la apropiación ilegal. En ese sentido los conceptos claves del actual Art. 165 son "apropiarse" y "bienes muebles". El primero, por definición comprende el "malversar, defraudar, ejercer control ilegal, usar, sustraer, apoderarse *o en cualquier forma hacer propi[o] cualquier bien o cosa en forma temporal o permanente*". Art. 7 (5).

Observamos que el Código Penal contempla todas las formas clásicas de desposesión, despojo o interrupción de la custodia, posesión propia o propiedad —aquello que conlleva aprehender una cosa y trasladarla— pero también abarcadoramente comprende todos los otros modos de lograr la posesión, transitoria o no, de un bien o cosa.

El Art. 8 del Código Penal que consagra el principio de legalidad no fue vulnerado.

## III

El restante error se refiere al hecho de que una vez comenzó el juicio el mismo fue suspendido dieciocho (18) veces. Mediaron cuatro meses y trece días desde su comienzo hasta que terminó. El apelante Rivera Tirado sostiene que ello violó su derecho a juicio rápido, impidió un contrainterrogatorio adecuado de los testigos de cargo e incapacitó al tribunal para aquilatar rectamente la prueba.

Para apreciar en su justa perspectiva este señalamiento, transcribimos el resumen esencialmente correcto que sobre el trámite expone el Procurador General:

El 1ro. de noviembre de 1983 las partes manifestaron estar preparadas para entrar en el caso y luego de juramen-

tarse a los testigos dio comienzo el caso. El fiscal expuso su teoría y comenzó el testimonio del Sr. Edwin Soto Pérez. Por estar ocupado el Tribunal en otro caso se suspendió dicho testimonio para continuar con el mismo al otro día. El 2 de noviembre luego de las partes manifestar estar preparadas se continuó con el interrogatorio directo de Soto y se comenzó el contrainterrogatorio, el cual fue suspendido por transferirse la continuación de dicha vista para el 10 de noviembre de 1983. *No surge en dicho momento objeción alguna de la defensa a dicha suspensión* de 7 días. El 10 de noviembre de 1983 estando presente la representación legal del acusado, el Tribunal motu propio [*sic*] suspendió la continuación del juicio por estar interviniendo en el notorio caso de Josean Báez en la etapa de selección de jurado. Señaló la continuación del juicio para el 19 de diciembre de 1983. *No surge objeción de clase alguna de la defensa* de la misma, por el contrario, el día 19 manifestó estar preparada. En dicha ocasión se presentó el testimonio del Sr. Fossas quien fue contrainterrogado por la defensa. Se alteró, además, el orden de la prueba a solicitud de la defensa desfilando el testimonio del Sr. Herrero. Terminado el directo y comenzado el contrainterrogatorio por el Ministerio Público de dicho testigo se decretó un receso hasta el día siguiente. *No hubo objeción alguna por parte de la defensa.* El 20 de diciembre las partes manifestaron estar preparadas y se continuó con el contrainterrogatorio de Herrero. Además, testificó el Sr. James Ryan. Se recesó entonces hasta el otro día cuando la defensa terminó de contrainterrogarlo y se transfirió la continuación de la vista del caso para el 16 de enero de 1984. *No hubo objeción alguna por parte del acusado* a la misma, quien a su vez compareció representado por su abogado y manifestó estar preparado para la continuación de la vista. Se presentó entonces el Sr. Glenn Mathers quien fue debidamente contrainterrogado. Al otro día se continuó con el redirecto de Mathers y el contrainterrogatorio del mismo por la defensa. Se procedió entonces a terminar el contrainterrogatorio del Sr. Edwin Soto y la defensa así lo hizo. *No surge de dicha minuta el que la defensa objetara a contrainterrogarlo.* Por el contrario procedió a hacerlo. Se presentó, además, el testimonio del Sr. Edwin Pastrana y el de José Cervoni Pérez. En cuanto a este último pudo comenzarse el exa-

men directo. Se transfirió el caso para el 26 de enero *sin objeción alguna de la defensa.* El 26 de enero luego de las partes manifestar estar preparadas, se continuó con el interrogatorio de Cervoni y se terminó el contrainterrogatorio. Se transfirió entonces la vista para el 30 de enero, de nuevo *sin objeción* de la defensa. Ese día testificó el Sr. Luis Pellot. Es interesante notar que de esta Minuta surge que la defensa le solicitó al Tribunal que le permitiera oír lo declarado por Pellot esa mañana. Dicha petición fue declarada sin lugar mas, sin embargo, surge que la defensa tenía allí una grabadora. Se decretó entonces un receso hasta el día 2 de febrero, fecha en que se terminó con el contrainterrogatorio por la defensa del Sr. Pellot. Luego de la pregunta por el Ministerio Público se transfirió la continuación de la vista para el 21 de febrero. *Tampoco hubo en este momento objeción alguna de la defensa.* El 21 de febrero se continuó con la vista, luego de las partes manifestar que estaban preparadas. Testificó entonces el Sr. Agosto y comenzó su contrainterrogatorio la defensa. Debido a que el Tribunal estaba ocupado en un caso por jurado se transfirió la vista para dos (2) días después, 23 de febrero, *sin objeción de la defensa.* En dicha ocasión se terminó de contrainterrogar al Sr. Agosto y se presentó al testigo de la defensa, Sr. Willy Merced, *dándose por sometido el caso.* Se decretó, entonces, un receso hasta el día 2 de marzo de 1984 para los informes de las partes, pero no se pudo celebrar la vista debido a que el Hon. Juez Batista se encontraba enfermo. Ante esta situación se señaló el caso para el 6 de marzo. En dicha fecha no compareció el acusado ni su abogado y el Ministerio Público procedió a informar que se había acordado celebrar la vista el 12 de marzo. Luego de las partes manifestar estar preparadas, el 12 de marzo el Ministerio Público consumó su primer turno de informe y la defensa comenzó el suyo. Se transfirió la vista para el 13 de marzo, fecha en que se dieron por sometidos los casos. Hizo constar entonces el Tribunal de Instancia que debido a que tenía que examinar la evidencia solicitaba dejar el caso hasta el próximo día 14 cuando declaró culpable al acusado. (Énfasis suplido.)

Nuestra Constitución en su Sec. 11, Art. II reconoce que todo "acusado disfrutará del derecho a un juicio rápido y

público". (¹) Como regla general, este derecho cobra vigencia desde que el imputado de delito es detenido o está sujeto a responder. *Pueblo ex rel. L.V.C.*, 110 D.P.R. 114, 126 (1980) ; *Hernández Pacheco* v. *Flores Rodríguez*, 105 D.P.R. 173 (1976). Se extiende hasta el acto de dictar sentencia en determinado plazo, lo cual es renunciable. *Pueblo* v. *Aponte Vázquez*, 105 D.P.R. 901, 903–904 (1977). Compárese *Pollard* v. *United States*, 352 U.S. 354 (1957).

En el pasado la jurisprudencia ha atendido principalmente el problema de las dilaciones anteriores al juicio. *Pueblo* v. *Santi Ortiz*, 106 D.P.R. 67 (1977) ; *Pueblo* v. *Vélez Castro*, 105 D.P.R. 246 (1976) ; *Pueblo* v. *Garrick*, 105 D.P.R. 178 (1976) ; *Pueblo* v. *Opio Opio*, 104 D.P.R. 165 (1975), y *Pueblo* v. *Arcelay Galán*, 102 D.P.R. 409 (1974). G. González Colón, *El derecho a juicio rápido en el procedimiento criminal*, XLVIII Rev. Jur. U.P.R. 643, 645–672 (1979). Otra situación se expuso en *Pueblo* v. *Aponte Vázquez*, supra, respecto al acto de imponer sentencia. La presente apelación nos ofrece la primera oportunidad de examinar el aspecto referente a la dilación en el desenvolvimiento del juicio, es decir, desde su inicio hasta el fallo o veredicto. (²)

La pronta solución de casos no es interés exclusivo del acusado sino de toda la comunidad. *Pueblo* v. *Rivera Navarro*,

---

(¹) El Informe de la Cámara de la Carta de Derechos, expuso que "[e]l derecho a un juicio rápido y público está garantizado por la enmienda sexta de la Constitución de Estados Unidos y el artículo 2 de la Carta Orgánica. Recomendamos la misma norma general y flexible que contienen esas disposiciones constitucionales, reafirmando el principio, para que las leyes y la administración lo cumplan en sus consecuencias específicas". 4 Diario de Sesiones de la Convención Constituyente 2569 (1951).

(²) Un recorrido hacia otras latitudes ilustra la escasa jurisprudencia existente sobre el particular. La casuística refiere el asunto de las suspensiones y recesos durante el juicio a la sana discreción del tribunal. 3 *Wharton's Criminal Procedure* Sec. 423 (1974). En otras palabras, el enfoque brindado explora la concesión o denegación de recesos y suspensiones durante el juicio en atención a la norma del abuso de discreción. *United States* v. *Sandoval-Villalvazo*, 620 F.2d 744 (9no Cir. 1980).

113 D.P.R. 642, 646 (1982); *García* v. *Tribunal Superior*, 104 D.P.R. 27, 30–31 (1975). Sin embargo, el énfasis es hacia el derecho del primero.

En *Barker* v. *Wingo*, 407 U.S. 514, 519–520 (1972), el Tribunal Supremo de Estados Unidos reconoció que existen varias preocupaciones comunitarias en apoyo de un juicio rápido, a saber: (*a*) evitar la congestión indebida de casos, lo cual permite a los acusados entrar y negociar más efectivamente reducciones en las clasificaciones de los delitos, mediante alegaciones preacordadas; (*b*) impedir que personas bajo fianza en espera del juicio tengan la oportunidad de cometer otro delito; (*c*) mientras más está un acusado en libertad provisional mayor es la tentación de evadir la jurisdicción y no someterse al proceso; (*d*) la tardanza entre el arresto y el castigo puede tener un efecto detrimental en la rehabilitación; (*e*) las detenciones preventivas, en espera de juicio, contribuyen a la aglomeración innecesaria de las prisiones; (*f*) el hacinamiento y condiciones deplorables de las prisiones pueden contribuir a motines; (*g*) exponer extensamente a esas condiciones carcelarias negativas tiene un efecto destructivo sobre la personalidad, y (*h*) toda detención excesiva antes del juicio, en sus múltiples efectos sociales y económicos, representa una pérdida para la sociedad.

Dicho Tribunal, con miras a los intereses del acusado, estimó que el juicio rápido fue diseñado para: (*a*) prevenir su detención opresiva y perjuicio; (*b*) minimizar sus ansiedades y preocupaciones, y (*c*) reducir las posibilidades de que su defensa se afecte. Al sumar éstas, junto con el impacto negativo que conlleva en el empleo del acusado, su familia y la búsqueda de la evidencia —si está detenido— se pone de manifiesto que las desventajas más serias recaen sobre el individuo. *Barker* v. *Wingo*, supra, págs. 531–533. Los intereses antes expuestos fueron reiterados en *United States* v. *MacDonald*, 435 U.S. 850 (1978). En éste se reafirmó a *Bar-*

*ker* v. *Wingo*, supra, y se sostuvo que el derecho a juicio rápido conlleva un análisis de diversos factores. La pesquisa de si se infringió o no ese derecho no debe descansar exclusivamente en una regla inflexible adherida a medidas de calendario que impida la ponderación de todos los intereses en juego. El enfoque es más bien de tipo pragmático y responde a la naturaleza inherente de la dinámica del derecho a juicio rápido. Es relativo, no absoluto. Juicio rápido no es un concepto incompatible con cierta tardanza, pero la demora no debe ser intencional ni opresiva. *United States* v. *Ewell*, 383 U.S. 116, 120 (1966). Véase *Pueblo* v. *Santiago Agricourt*, 108 D.P.R. 612 (1979).

■ *Barker* v. *Wingo*, supra, también seguido en *Solem* v. *Helm*, 463 U.S. 277 (1983), ha esbozado cuatro criterios a examinarse en conjunto y con otras circunstancias relevantes para evaluar las reclamaciones de violaciones al derecho a juicio rápido: (1) duración de la tardanza; (2) razones para la dilación; (3) si el acusado ha invocado oportunamente ese derecho, y (4) perjuicio resultante de la tardanza. Nota: *The Right to a Speedy Trial*, 20 Stan. L. Rev. 476, 478 (1968); A. G. Amsterdam, *Speedy Criminal Trial: Rights and Remedies*, 27 Stan. L. Rev. 525–543 (1975); G. P. N. Joseph, *Speedy Trial Rights Inapplication*, 48 Fordham L. Rev. 611–656 (1980). Ninguno de los factores es determinante y están sujetos a un balance. D. Fellman, *The Defendant's Rights Today*, Wisconsin, Univ. Wisconsin Press, 1976, pág. 115.

Por su equivalencia conceptual, podemos hacerlos extensivos al período del juicio en su fondo. Confrontémoslos a la luz del trámite procesal seguido en el caso de autos.

1. *Duración de la tardanza*

Este es el primer factor a examinarse. Transcurrieron incuestionablemente cuatro meses y trece días desde que comenzó el juicio y se dictó el fallo. De éstos, tres meses y 21 días correspondieron propiamente al proceso, a intervalos, de

desfilar prueba. A partir del 21 de febrero sólo quedaron pendientes los informes del fiscal y la defensa. Consumidos estos turnos el 13 de marzo, al día siguiente, el tribunal emitió su fallo. El término excede el período de 120 días que la Regla 64 (n) de Procedimiento Criminal considera razonable para una persona ser sometida a juicio luego de su arresto.

██ Las reglas no prescriben expresamente período alguno para dilucidar en sus méritos una causa criminal. Después de todo, la dinámica de cada causa es singular y única en atención a la naturaleza de los cargos, número de testigos, el carácter de cualquier otra prueba documental o tangible. Son múltiples los elementos imponderables susceptibles de acaecer. Pueden ocurrir justificados intervalos debido a suspensiones o recesos fundados. Ahora bien, por la transcendencia que representa la recepción de prueba —particularmente la oral— lo razonable es que el trámite se caracterice por una unidad y que la vista plenaria e itinerario judicial discurran sin interrupciones. Esta norma, denominada *principio de concentración* y *unidad de vista*, aspira, en lo posible, a que la audiencia receptora sea *una* y *continua* durante las sesiones consecutivas necesarias hasta su conclusión.

██ En cuanto a experiencia empírica, en nuestra jurisdicción, el único dato disponible, recogido en una investigación de campo reciente, reveló que desde la lectura de acusación a fallo o veredicto, la mediana de tiempo transcurrido fue "74 días, oscilando desde 60 días en Caguas hasta 94 en San Juan". *Informe del comité sobre normas y objetivos para acelerar el trámite de casos en el tribunal de primera instancia*, diciembre 1984, Vol. I, pág. 144. Por ésta y las otras razones mencionadas, no podemos establecer a priori un término fijo o uniforme de duración de un juicio en su fondo. Repetimos, las complejidades y dinámica envueltas, exigen que la razonabilidad de una dilación procesal dependa de muchísimos factores que varían de caso a caso. Sin embargo,

cualquier suspensión o aplazamiento justificado debe ser **lo** más breve posible.

El caso de autos en algunos extremos fue complejo. **Hubo** abundante prueba documental y atestaron diez (10) testigos. A dos de ellos hubo que proveerles intérpretes, circunstancia que ocasionalmente demora la presentación de testimonios. Aun así, de su faz podemos concluir que la dilación fue excesiva. No hubo múltiples acusados, representación legal pluralista y el juicio se ventiló ante tribunal de derecho.

Sin embargo, esta tardanza, por sí sola, no dispone **del** planteamiento. Es menester evaluar los otros factores.

## 2. *Razones para la dilación*

De ordinario, son imputables al Estado las dilaciones "institucionales" como las del caso de autos (enfermedad del juez, congestión del calendario del tribunal, receso por vacaciones del tribunal, etc.). Véanse *Jiménez Román* v. *Tribunal Superior*, 98 D.P.R. 874 (1970); *United States* v. *Carini*, 562 F.2d 144, 149 (2do Cir. 1977). Ante una tardanza excesiva y un reclamo del acusado, corresponde al Ministerio Fiscal demostrar la existencia de justa causa. El tribunal evaluará cuidadosamente la razón institucional aducida. Es de notar que "entre los factores a ser pesados con menos rigurosidad están las demoras inintencionadas debido a los calendarios recargados o a insuficiencias del personal en contraste con las demoras intencionales, dirigidas a entorpecer la defensa . . .". *Strunk* v. *United States*, 412 U.S. 434, 436 (1973).

En este caso, una vez comenzó a desfilarse la prueba, la primera suspensión fue una transferencia para el día siguiente, debido a que el tribunal estaba dilucidando otro asunto. La segunda, de siete (7) días —incluyendo un fin de semana— no aparece explicada. La tercera el tribunal estaba ventilando otro caso y seleccionando el jurado. La cuarta se debió a un receso luego de ventilarse vistas durante dos días (mañana y tarde) para el día siguiente. La quinta, después

de un día de sesión (transcurrió casi un mes del período navideño) no aparece explicada. La sexta fue una continuación regular para el otro día. La séptima, tampoco explicada, fue una suspensión de nueve días. Continuó el proceso y se produjo entonces la octava posposición de cuatro días. Siguió el desfile de prueba y luego hubo otra posposición de tres días seguida de una de 19 días. No surgen explicaciones para éstas. Finalmente continúa la vista y la defensa desfiló su prueba y sometió su causa el 21 de febrero de 1984.

A partir de ese momento, pendientes los informes de las partes, se produjo entonces una nueva suspensión por dos días. Después, ocurre otra más no explicada de ocho días. El caso debió suspenderse nuevamente por enfermedad del juez. Se señaló para verse cuatro días después, pero a este señalamiento acudió el fiscal quien expresó que las partes habían acordado que el proceso siguiera seis días después. La estipulación así informada resultó en que los días 12 y 13 de marzo las partes rindieran sus informes. El 14 de marzo el tribunal emitió su fallo condenatorio.

De lo expuesto no se desprenden con certeza todas las razones que motivaron algunas de las suspensiones. Es materia de información oficial y pública, susceptible de conocimiento judicial, el alto grado de congestión de asuntos criminales en los tribunales del país, en particular el Tribunal Superior, Sala de San Juan. (³)

■ Reiteramos que la congestión de casos ante los tribunales, por sí solo, no constituye justa causa para excusar la infracción al derecho a juicio rápido. *Jiménez Román* v. *Tribunal Superior*, supra. Este derecho no puede ser menoscabado por razones tales como insuficiencia de recursos humanos y

---

(³) En vista de ello, es argüible que un número sustancial de esas suspensiones pudieron deberse a la congestión del calendario del tribunal. Salvo los recesos normales de un día para otro, la indisponibilidad por enfermedad del juez y una estipulación de las partes para un aplazamiento, no aparece ningún otro motivo.

presupuestarios. Ambos problemas exigen atención de las autoridades correspondientes. La asignación de recursos adecuados a todos los componentes que intervienen en el sistema de justicia criminal es obligación ineludible del Estado.

3. *Si el acusado ha invocado oportunamente su derecho a juicio rápido*

Según antes indicado, la falta de objeción oportuna a las suspensiones injustificadas puede constituir, en unión a otros factores a ser considerados, un impedimento para invocar exitosamente en apelación la infracción del derecho a un juicio rápido. *Pueblo* v. *Santi Ortiz*, supra. Sin embargo, en *Barker* v. *Wingo*, supra, pág. 521, el Tribunal Supremo federal reconoció que en algunas ocasiones, a diferencia de otros derechos constitucionales, una infracción al juicio rápido puede resultar ventajosa al acusado en consideración a la posibilidad de que la prueba del Ministerio Fiscal se debilite o desaparezca con el tiempo. En *Pueblo* v. *Rivera Navarro*, supra, págs. 646–647, dijimos que "para algunos acusados el propiciar suspensiones 'adelanta' sus causas, pues contribuye al deterioro de la evidencia por la indisponibilidad de testigos —ausencia, desaparición o muerte— y pérdida de la memoria sobre hechos esenciales. Estudios en varias jurisdicciones demuestran que por regla general, no les interesa ventilar sus casos con prontitud. Puerto Rico no es la excepción. Esta actitud forma parte de la psicología y naturaleza y conducta humana inherentes a la dinámica procesal. Choca con el ideal constitucional de un 'juicio rápido'. Al protagonista del esquema forense penal le resulta ventajoso controlar indirectamente el momento en que se ventile el caso en su fondo. Repetimos, cada suspensión conlleva unos desembolsos que no sólo gravan la Rama Judicial, sino a los demás componentes principales e incidentales del sistema: policía, fiscales, asistencia legal y ciudadanía en general. Implica gastos relacionados con los trámites y documentos ordinarios, citación,

pago de dietas y otros. Los testigos experimentan gastos en transportación, pérdida de ingresos que no son compensables mediante las módicas dietas y sufren distintos tipos de inconveniencias. Sobre todo, afecta y debilita la confianza en la administración de la justicia y fomenta un sentido de injusticia, inseguridad e incertidumbre por la tardanza en la determinación final fáctica y jurídica de la controversia".

No surge de las minutas en los autos originales que el apelante Rivera Tirado estuviese ajeno a las posposiciones y recesos de su proceso o que su abogado hubiese accedido a tales demoras sin informárselo. Sobre este extremo, las mismas no reflejan que se opusiera a los recesos y suspensiones decretadas una vez comenzado el desfile de prueba. En apelación lo plantea por primera vez.

### 4. Perjuicio resultante de la dilación

■ El perjuicio específico ocasionado es otro factor a ser considerado. No puede ser abstracto ni apelar a un simple cómputo de rigor matemático. Tiene que ser real y sustancial. (⁴) En este caso, el perjuicio particular alegado por el apelante es que las frecuentes interrupciones del proceso le impidieron: (1) contrainterrogar adecuadamente, y (2) privó al juez de aquilatar correctamente la prueba. Analicémoslos.

El primero es inmeritorio. En toda ocasión que se reanudó el proceso su abogado manifestó que estaba debidamente preparado. Salvo un pedido en la tarde del 30 de enero para oír el testimonio parcial presentado durante la mañana por el testigo Luis A. Pellot —que el tribunal denegó disponiendo que la defensa lo escuchara en su propia grabadora— nunca

---

(⁴)*Barker* v. *Wingo*, 407 U.S. 514, 582 (1972), ilustra situaciones de claro perjuicio por la tardanza: (1) muerte o desaparición de un testigo, o (2) la pérdida de memoria por un testigo de la defensa. Sobre ésta el Tribunal Supremo federal reconoció que "no siempre se refleja en el récord pues lo que está olvidado raras veces puede demostrarse". (**Traducción nuestra.**)

levantó la cuestión. En una etapa avanzada estipuló su posposición. La lectura de la exposición narrativa de la prueba revela una adecuada defensa. De hecho, logró una absolución en el caso G-83-1860 sobre apropiación ilegal agravada al argumentar que el furgón núm. 125020 fue vendido por Navieras, posición con la cual el Ministerio Fiscal coincidió. Pudo contrainterrogar vigorosa y eficazmente. Un examen acucioso de las minutas revela que excepto los testimonios de Edwin Soto Pérez y de José L. Cervoni Pérez, (5) todos los demás ocho testigos de cargo fueron contrainterrogados por la defensa después del directo del fiscal o al día siguiente. Igual ocurrió en la etapa del redirecto y recontrainterrogatorio. El apelante estuvo en todo momento gozando de libertad bajo fianza. Por mediación de su abogado tuvo amplia oportunidad de explorar las contradicciones de los testigos de cargo y presentar apropiadamente su causa. Además, grabó los procedimientos, lo que le ayudó y capacitó para darle continuidad e hilvanar su línea de contrainterrogatorios.

En cuanto al segundo argumento tampoco tiene razón. El proceso fue ante tribunal de derecho y no ante un jurado. Ello reduce el riesgo de confusión en que se basa su argumento. El juez toma notas y puede valerse de ellas cada vez que tiene dudas. "En la medida en que el recordar está relacionado con el estado socio-educacional, podemos esperar que los jueces recuerden mejor que los jurados la evidencia y que su recuerdo se facilite al permitírseles tomar notas lo cual no le es permitido al jurado." (Traducción nuestra.) J. Marshall, *Law and Psychology in Conflict*, Nueva York, Bobb-Merrill Co., 1966, pág. 90. Tiene a su alcance la grabación oficial de los pro-

---

(5) El directo de Soto Pérez se realizó los días 1 y 2 de noviembre de 1983. La defensa comenzó a contrainterrogarlo en ese último día. No surge de autos razón para que no continuara en el próximo señalamiento. El 17 de enero de 1984 concluyó dicho contrainterrogatorio. En cuanto a Cervoni Pérez, éste prestó testimonio directo y la defensa lo contrainterrogó el mismo día, 17 de enero de 1984. Los turnos del redirecto y re-contrainterrogatorio se efectuaron en el señalamiento más próximo: 26 de enero.

cedimientos. Además, su entrenamiento y experiencia lo sitúan en mejor posición que el jurado para adoptar las medidas de rigor dirigidas a que las suspensiones y recesos afecten lo menos posible los intereses del acusado.

■ Nuestro sistema de adjudicación de controversias y reglas de evidencia está cimentado en la capacidad especial y destreza de los jueces para evaluar la prueba integralmente. Rechazamos la solución mecánica de que toda demora o interrupción en la recepción de prueba o transcurso de tiempo en la solución anula, per se, el proceso o dictamen.

Aunque el apelante no nos ilustra específicamente un breve esquema de posibles investigaciones psicológicas aplicables al derecho, refleja que el proceso mental de evaluar y aquilatar prueba testifical está integrado y corresponde a las denominadas *psicojurídicas de los operadores* (psicodinámica del proceso judicial) y *psicojurídica probatoria*, desglosada, en lo pertinente, a la *psicología del testimonio*. L. Muñoz Sabate, R. Bayes y F. Munné, *Introducción a la Psicología Jurídica*, Méjico, Ed. Trillas, 1980, págs. 36–37.

■ Sin pretensiones de penetrar y agotar tan fascinante e intrincada cuestión, nuestra jurisprudencia ha abordado someramente este fenómeno en las dos vertientes antes esbozadas: psicología del testimonio y evaluación y formulación de la consciencia judicial. Sobre la primera, en *Pueblo* v. *Morales Rivera*, 112 D.P.R. 463, 464 (1982), indicamos que en el proceso investigativo penal intervenían "numerosos factores entre los cuales se destaca la disponibilidad de testigos oculares. Sobre éstos, el criterio cualitativo testimonial, a saber, la habilidad del deponente para *percibir* el acontecimiento, aptitud para *conservarlo* en su memoria, capacidad para *evocarlo*, modo de *querer* expresarlo, y *cómo* puede hacerlo, es esencial. El elemento tiempo resulta importante y, de ordinario, afecta estos factores". Respecto a la segunda vertiente —aquilatar prueba— en *García* v. *A.F.F.*, 103 D.P.R.

356, 357–358 (1975), dijimos que "[e]n nuestro sistema de adjudicación de controversias, bajo las normas evidenciarias y procesales vigentes, todo proceso de presentación de prueba representa un esfuerzo tendente a reconstruir en la forma más fiel y exacta los hechos acaecidos fuera del escenario judicial. De ordinario, tal presentación se efectúa meses o años después de acontecidos los hechos por lo que el factor inexorable del tiempo interviene con la memoria afectando las imágenes, percepción, personas y sitios. Ingredientes adicionales tales como el grado de inteligencia del testigo, su facilidad o dificultad para verbalizar y explicar, el nerviosismo natural que genera la sala de un tribunal, las expectativas de una confrontación de lo atestado con el contrainterrogatorio, el interés en el desenlace final del caso y un sinnúmero de imponderables, imponen sobre los tribunales de instancia la más delicada función del quehacer judicial humano: el descubrir la verdad haciendo el mayor esfuerzo en dirimir prueba conflictiva y en muchas ocasiones incompleta".

■ El planteamiento del apelante de que el simple transcurso del tiempo por razón de las suspensiones y recesos impidió al juez de instancia evaluar correctamente la prueba nos mueve a concentrar sucintamente en el aspecto del factor tiempo sobre la memoria. A tales fines, hemos de partir del supuesto generalizado —con apoyo en diversos estudios científicos psicológicos— que en "cuanto al lapso transcurrido desde el momento de percepción de los hechos, es notoria la desvalorización en función directa del tiempo". E. Couture, *Estudio de Derecho Procesal Civil*, 2da ed., Buenos Aires, Ed. Depalma, 1978, T. II, pág. 213; M. Cénac, *El testimonio y su valor desde el punto de vista judicial*, 24 Rev. Fac. Der. 45–77 (1963); J. Marshall, *op. cit.*, págs. 25–37; F. Gorphe, *La Crítica del Testimonio* (M. Ruiz-Funes), 3ra ed., Madrid, Ed. Reus, 1950, págs. 309–313. Bajo esta premisa —estando sujeto al convencimiento del juez a la atestación ajena (Benthan decía que los testigos son los ojos y los oídos de la jus-

ticia)— es perfectamente plausible la suposición de que el juzgador, como todo ser humano, no está exento a que el tiempo, en mayor o menor grado, afecte su capacidad para recordar algunos detalles no susceptibles de perpetuar en sus notas, en un récord taquigráfico o en una grabación.[6] Los gestos, movimientos, y demás circunstancias faciales no pueden ser reproducidos salvo la técnica de la filmación.

Sin embargo, la psicología moderna al clasificar la memoria en sus formas *perceptivo-motriz* y *lógica*, acepta que "distintos adultos pueden tener una mayor inclinación hacia un tipo determinado de recuerdos. Esta variación depende del distinto tipo de experiencias o entrenamiento". Davini-Gellon de Salluzi-Rossi, *Psicología General*, Buenos Aires, Ed. Kaperlusz, 1978, págs. 156–157;[7] Gorphe, *op. cit.*, págs. 107–108. "[E]l ser humano recibe la información (mediante su equipo sensorial), la almacena en la memoria y la recupera, para su uso, cuando la requiere o le conviene, mediante señales que emanan, a veces, de su voluntad y, a veces, de meros automatismos dependientes de hábitos del sistema muscular vinculado al nervioso." C. Varona, *Introducción a la Sicología*, Madrid, Ed. Playor, 1984, págs. 158, 160. Los estudiosos distinguen las secuencias básicas de la memoria en inmediata y a largo plazo. De manera casi unánime se acepta que existen tres fases de intervención de la memoria: (1) aprendizaje (la información se adquiere y entra al sistema de memoria individual); (2) conservación (los datos son retenidos de modo latente), y (3) actualización (lo aprendido y las ex-

---

[6] Aun así, la Regla 186 de Procedimiento Criminal autoriza que un juez sustituya a otro durante el proceso por razones de inhabilidad debido a muerte, enfermedad o cesantía en el cargo. Su capacitación será a base de familiarizarse con el expediente y récord del caso. Véase Anot., *Substitution of Judge in Criminal Case*, 83 A.L.R.2d 1032 (1962).

[7] La gran experiencia, conocimiento, y ecuanimidad del juez sentenciador en el caso de autos, Hon. Elpidio Batista Ortiz, fue reconocida específicamente en *Pueblo* v. *Arreche Holdun*, 114 D.P.R. 99, 115 (1983) y *Pueblo* v. *De Jesús Rivera*, 113 D.P.R. 817, 826 (1983).

periencias vuelven "a la conciencia y [son] aplicables a la conducta presente. Esta posibilidad de actualización de las expresiones previas se logra gracias al dinamismo de la vida psíquica"). Davini-Gellon de Salluzi-Rossi, *op. cit.*, págs. 157–160; Penrod, Loftus & Winker, *The Reliability of Eyewitness Testimony: A Psychological Perspective*, en Kerr & Bray, *The Psychology of the Courtroom*, Nueva York, Academic Press, 1982, págs. 121–157; Saks & Hastie, *Social Psychology in Court*, Nueva York, Van Nostrand Reinhold Co., 1978, págs. 164–190.

El fenómeno psicoanalítico del problema de estimar credibilidad entre el testigo y el juez puede medirse desde distintas perspectivas. Para algunos magistrados es probable que la primera impresión o el primer testigo sea determinante. Sin embargo, no es posible generalizar y concluir que evaluado el proceso integralmente, los jueces, mediante análisis sereno y criterio comparativo no puedan desprenderse de esa impresión original y entonces proceder a dirimir certeramente el alcance y veracidad de ese testigo a la luz de otros testimonios y demás prueba. Como afirma Gorphe, *Las Resoluciones Judiciales, op. cit.*, págs. 97–98:

[L]a comprobación judicial no es verdadera observación científica de los fenómenos, de la cual decía CLAUDE BERNARD: "El observador debe ser el fotógrafo de los fenómenos . . . Su espíritu debe ser pasivo, es decir, callarse; escucha a la naturaleza y escribe a su dictado". Aquí, la idea no cesa de obrar, incluso durante la comprobación, que permite comprender los hechos a medida que se presentan, y seleccionarlos, para sólo dedicarse a los que presenten interés en la causa o, por lo menos, para ponerlos de relieve: la observación continúa mezclada con [apreciación].

En primer lugar es una apreciación [provisional], que se precisa y robustece, *o se rectifica, a medida que se progresa en la reconstrucción de los hechos*. El desarrollo de la apreciación, para conservarse positivo, debe seguir el de las comprobaciones. *Tengamos cuidado con no olvidar que toda opinión que les precede no puede tener valor más que de hipó-*

*tesis previa.* La frase de BERTILLON: "Sólo se ve aquello que se mira, y sólo se mira lo que se tiene en el espíritu", *constituye una verdad para los testigos, no un método para los jueces.* El juez no espera el cierre del debate *para intentar formarse una opinión, pero no debe formular su opinión sino al final;* y, si es preciso, tras haber modificado varias veces su manera de enfocar la situación. Su concepción provisional del asunto, la denomina con razón una *primera impresión: está formada de intuición y de sentimiento de derecho tanto como de comprobación.*

"Si el juez capaz *(tüchtige)* —explica el magistrado ZACHARIAS— recoge los hechos de la causa escuchando, interrogando y averiguando, *la experiencia de la vida, la formación intelectual y el saber jurídico funcionan en él con indisoluble unidad.* Por acción de tales factores, se forma en seguida en su espíritu, natural y necesariamente, una impresión sobre el estado de derecho. Una de las partes parece tener para él razón en un punto; la otra en otro distinto." *Esa impresión o ese sentimiento del derecho (Rechtsempfinden, Rechtsgefühl), que surge del contacto con los hechos de autos, antes de la aplicación consciente del derecho, expresa la reacción del juez ante tales hechos, por efecto de su mentalidad profesional y jurídica, de su experiencia y de sus ideas.* Puede decirse acertadamente, con ZACHARIAS, que se trata de un [juicio sumario], formado por medio de un vistazo sobre el conjunto de la causa; *pero hay que detallar que se trata de un juicio de valor puramente elemental y provisional.* (Énfasis suplido y escolios omitidos.)

■ Aunque lo ideal es que el proceso de recepción de prueba sea ininterrumpido, no podemos refrendar la tesis absolutista del apelante de que el simple discurrir del tiempo afecta inexorablemente la capacidad de los jueces [8] para

---

[8] De prevalecer esta hipótesis, su impacto sería detrimental y negativo a todo el sistema de administración de justicia. Lo haría inoperante. Toda causa judicial —excepto aquellas cuya prueba se desfile en un mismo día o sucesivamente en pocos días y el juez resuelva inmediatamente— sería susceptible de ser impugnada desde su incepción. La norma sería aplicable a aquellos casos criminales, que por razón de muchos testigos, múltiples acusados, representación legal pluralista, abundante y compleja prueba

aquilatar correcta y justamente la prueba testifical. "[L]a sentencia es una operación humana de la inteligencia y de la voluntad. Su valor será pues, el valor que puedan atribuirle esa inteligencia y esa voluntad. Valdrá lo que el juez que la dicte valga, en su más profundo significado intelectual y moral." Couture, *op. cit.*, Vol. 1 pág. 84. (9)

■   Repetimos, de las vivencias aisladas individuales no nos es posible derivar razonablemente generalizaciones fundadas. Ni la ciencia de la psicología como tampoco las normas jurídicas apoyan esa tesis. No tenemos base para sostener la restrictiva visión de que la validez y corrección de dirimir credibilidad dependa exclusivamente del factor tiempo, de la memoria del juzgador o de su primera impresión *vis à vis* la segunda. La psicogenética de juzgar es algo más complejo.

"Juzgar, decía Platón, es representarse un mundo inteligible en el cual todas las ideas que entran en el juicio se desarrollan en una inmutable e inseparable unidad."

---

documental —aun ventilándose ininterrumpidamente— tardan más de tres meses. Curiosamente, en esta circunstancia ¿no estaría el juzgador en una situación mucho más difícil para dirimir credibilidad? ¿No es posible entonces que su memoria se afecte más? ¿No anularía todo el sistema de adjudicar controversias en causas civiles?

(9) Un insigne jurista compendia así la cuestión:

"La sentencia, reflejo y culmen del resultado del proceso, hunde sus raíces indefectiblemente en el espectro factual que de aquél se deriva. Pero la interpretación de los hechos, la reconstrucción escenográfica de su originación, con su sucesión cronológica y sus implicaciones subjetivas, es la delicada función recreativa y de síntesis que viene reservada a los Jueces al término de desarrollo del proceso penal. El proceso penal —ha dicho Carnelutti— hace referencia, típicamente, no a un juicio de realidad, sino a un juicio de existencia, puesto que el enriquecimiento del sujeto mira precisamente a la existencia o al pasado que son la misma cosa. El justo medio exige —apunta Fenech— que la sentencia tenga como fundamento la convicción formada por el juzgador a base de las pruebas efectuadas, sin limitación, pero dentro del proceso mismo, con lo que se concede una garantía a las partes, que de otra manera quedarían al entero arbitrio del que hubiera de resolver, y el proceso penal desaparecería por desintegración de sus elementos fundamentales." F. Soto Nieto, *Correlación entre Acusación y Sentencia*, Madrid, Ed. Montecorvo, 1973, págs. 10-11.

En este pensamiento se resume el doble proceso intelectual que concluye con la formulación del juicio.

En efecto, no basta la simple percepción de los acontecimientos; es necesario que el juez los analice inteligentemente para luego coordinarlos en esa labor de síntesis que es la sentencia.

Toda la vida intelectual está en estos dos procesos; el uno de descomposición y de análisis, el otro de asimilación y de síntesis. Todas las impresiones que llegan a la consciencia a través de los sentidos, todas las ideas que surgen en nosotros, sugeridas por la conversación o por la lectura, todos los sentimientos, todas las impresiones que pueden ponernos en conocimiento de las relaciones que tenemos con el mundo exterior, y de nuestros vínculos con los otros hombres, todos los fenómenos síquicos, en una palabra, pasan más o menos por estos dos procesos de elaboración.

El análisis se realiza en virtud del juego espontáneo o directo de la reflexión, de las ideas, de las tendencias ya organizadas, de las costumbres ya adquiridas que separan y aíslan, en los hechos nuevos que se conocen, los elementos que pueden adaptarse a ellas y complementarlas. E. Altavilla, *Sicología Judicial,* Buenos Aires, Ed. Depalma, 1970, Vol. 2, pág. 1090.

## IV

Recapitulando, aun cuando en el caso de autos la dilación fue excesiva y el récord no refleja satisfactoriamente la existencia o no de justa causa, el apelante Rivera Tirado no objetó las suspensiones y recesos. Tampoco ha podido demostrarnos perjuicio real y sustancial. Ni siquiera sugiere que la demora haya sido intencionada. El planteamiento en apelación es uno en abstracto y tardío. Siguiendo el método de análisis pautado, no encontramos motivo para conceder automáticamente la revocación solicitada a base de una aplicación laxa del concepto constitucional de juicio rápido.

No podemos finiquitar, sin dejar de reconocer que la génesis psicológica de todo fallo es (o debe ser), producto de un análisis en que interviene una relación lógica, proyección del

pensamiento, percepción, apreciación, intuición intelectual, inteligencia, expresión y otros múltiples elementos. "El juez es un hombre viviente, y juzga con toda su alma; realiza obra no tan sólo racional, sino humana. La jurisprudencia, en sus aspectos multiformes, es a la vez una ciencia normativa y un arte práctico, que sirve para resolver las dificultades más diversas de la vida social. El arte de juzgar apela al espíritu de sutileza aliado con el espíritu geométrico, incluso en la aplicación de los principios del derecho. Aun debiendo someter sus razonamientos al rigor lógico, el juez piensa complacido, con GOETHE, que 'nada hay más ilógico que el abuso de la lógica'. Debe el juzgador dar pruebas de sagacidad, de prudencia y, sobre todo, de buen sentido." Gorphe, *Las Resoluciones Judiciales, op. cit.*, pág. 38.

Para el descargo de esta delicada responsabilidad "no es fácil señalar el ritmo que habrá que imprimir a una función que en su esencia exige reposo, pausa, calma. Armonizar la maduración de la decisión y la urgencia en la respuesta que demandan las partes interesadas es el difícil resultado de conjugar el procedimiento adecuado con la iniciativa del juez, que debe estimularse". R. Rojo Urrutia, *El poder judicial en tiempo de crisis*, 242 Rev. Gen. Leg. Jur. 43–44 (1977). En esa iniciativa, por mandato constitucional los jueces de instancia tienen que adoptar las medidas necesarias para que los procesos se ventilen sin dilaciones injustificadas y así evitar apuntamientos de la naturaleza aquí considerada. En tal misión, las minutas deben reflejar claramente las razones para toda suspensión, posposición del fallo o de sentencia, y la postura y acuerdos de las partes.

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Rebollo López emitió opinión disidente a la cual se unen el Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Hernández Denton.

448

—0—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López a la cual se unen el Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Hernández Denton.

Mucho es lo que se ha escrito en esta jurisdicción sobre la importancia del derecho a "juicio rápido" —garantizado por la Sec. 11 del Art. II de nuestra Constitución— en lo referente a *la etapa "pre-juicio"* del procedimiento criminal. Véanse, entre otros casos, lo expresado por este Tribunal en *Pueblo* v. *Arcelay Galán,* 102 D.P.R. 409 (1974); *García* v. *Tribunal Superior,* 104 D.P.R. 27 (1975); *Pueblo* v. *Opio Opio,* 104 D.P.R. 165 (1975); *Pueblo* v. *Garrick,* 105 D.P.R. 178 (1976); *Pueblo* v. *Vélez Castro,* 105 D.P.R. 246 (1976); *Pueblo* v. *Santi Ortiz,* 106 D.P.R. 67 (1977).[1] No obstante el "acto del juicio en sí" ser una etapa aún más significativa e importante —la misma constituye la culminación de todo el procedimiento ya que es en el juicio donde finalmente se va a dilucidar la inocencia o culpabilidad del acusado— curiosamente este Tribunal no había tenido hasta el día de hoy la oportunidad específica de expresarse respecto a la "aplicabilidad" del derecho a juicio rápido en lo referente a esa etapa de los procedimientos.

Estamos contestes en que el derecho constitucional de todo acusado a un "juicio rápido" se infringe por la ocurrencia de una dilación irrazonable o excesiva en el desenvolvimiento del proceso a que éste sea sometido. *Cf. Pueblo* v. *Aponte Vázquez,* 105 D.P.R. 901 (1977). Somos de la opinión, sin embargo, que

---

[1] En *Pueblo* v. *Arcelay Galán,* 102 D.P.R. 409, 414 (1974), (Trías Monge), al resumir las razones de la importancia de que un acusado sea sometido a juicio, so pena de desestimación de la causa, lo más rápidamente posible expresamos que "se desea no exponer al acusado a la ansiedad que provoca la incertidumbre que acompaña el inicio de todo proceso penal, o perjudicar su defensa al aumentar la posibilidad de que desaparezcan sus testigos o su memoria se nuble, o prolongar su encarcelamiento si no le ha sido posible prestar fianza".

los criterios que tradicional y generalmente han sido utilizados por los tribunales para evaluar si hubo o no una violación de ese derecho en la etapa pre-juicio —los cuales son: duración de la tardanza, razón para la dilación, invocación oportuna del acusado del derecho a juicio rápido, y perjuicio resultante de la tardanza— ([2]) no son del todo aplicables a la situación de las dilaciones ocurridas durante el juicio. Ello por razón, precisamente, de que ésta es una etapa aún más crítica y fundamental que la anterior, donde están envueltos unos factores intangibles y subjetivos respecto al proceso de evaluación de la prueba por parte del juzgador de los hechos, lo cual requiere, inclusive, que seamos aún más exigentes. Es por dicha razón que nos vemos obligados a disentir.

## I

En un proceso criminal, como es de todos conocido, está en juego no sólo la reputación de un ser humano sino su libertad. Todo gira alrededor de la decisión que haga el juzgador de los hechos —juez o jurado— sobre si el Estado ha cumplido con su obligación de probar más allá de duda razonable la culpabilidad de la persona a quien le imputó la comisión de delito. Dicha determinación depende —principalmente y como regla general— de la *apreciación* que de la *prueba testifical* presentada haga el juzgador de los hechos. En palabras más sencillas, de la *credibilidad* que le merezca a ese juzgador el testimonio de los testigos presentados por una o ambas partes.

Todos aquellos que han tenido la difícil encomienda de adjudicar credibilidad están conscientes de que constituye una realidad el hecho de que en la mayor parte de las ocasiones no es posible verbalizar o precisar "el por qué" se le cree o no a un testigo en particular. Ello depende de muchos factores. Como sabemos, la Regla 44 de las Reglas de Evidencia para el Tribunal General de Justicia nos señala algunos de los

---

([2])Véase *Barker* v. *Wingo,* 407 U.S. 514 (1972).

que deben ser tomados en cuenta al aquilatar el testimonio de un testigo. Éstos son: *comportamiento del testigo mientras declara y la forma en que lo hace;* naturaleza o carácter del testimonio; grado de capacidad del testigo para percibir, recordar o comunicar cualquier asunto sobre el cual declara; existencia o inexistencia de cualquier prejuicio, interés u otro motivo de parcialidad por parte del testigo, y manifestaciones anteriores del testigo. [3]

La determinación final que sobre credibilidad hace el juzgador de los hechos depende, sin embargo, de muchas otras consideraciones. Frecuentemente, a manera de ejemplo, se da el caso de que un testimonio que parece merecer credibilidad desmerece ante el testimonio de un segundo testigo. No debe haber duda de que no es lo mismo comparar un testimonio contra otro que fue escuchado tan sólo unos días antes como cuando hay que comparar uno a la luz de otro testimonio que es recibido en evidencia cuatro (4) meses después. Y es que el pasar del tiempo necesariamente tiene que desmerecer y afectar la capacidad del juzgador para aquilatar una prueba, haciendo en su consecuencia mucho más difícil la función de impartir justicia. [4]

*Ahí radica precisamente la importancia de que el juicio, una vez ha comenzado, tenga su conclusión lo más rápidamente posible.* Es extremadamente importante que el juez, o el jurado, antes de emitir su fallo tengan "fresco" en su mente

---

[3] Precisamente porque presumimos que el juzgador, al adjudicar credibilidad, ha tenido en mente estos factores, especialmente los intangibles, es que dicha adjudicación nos merece gran deferencia; con la cual, como es sabido, no intervendremos en apelación salvo en casos de pasión, prejuicio y parcialidad. *Pueblo v. López Pérez,* 106 D.P.R. 584 (1977).

[4] Por ello es que no es convincente el argumento de que el apelante no resultó perjudicado por las dilaciones habidas en el presente caso por razón de que el mismo fue celebrado por tribunal de derecho. Si bien los jueces son técnicos del derecho, *Pueblo v. De Jesús Rivera,* 113 D.P.R. 817 (1983), no por ello dejan de ser seres humanos que sufren con el transcurso del tiempo las mismas pérdidas en sus *facultades retentivas* que los señores del jurado.

no sólo el contenido del testimonio vertido por los testigos *sino el "recuerdo del testigo en sí"*. Procede que nos preguntemos: ¿de qué le "sirve" a un acusado el no haber sido expuesto en la etapa pre-juicio a la "ansiedad que provoca la incertidumbre que acompaña el inicio de todo proceso penal", o "perjudicar su defensa al aumentar la posibilidad de que desaparezcan sus testigos o su memoria se nuble", o "prolongar su encarcelamiento si no le ha sido posible prestar fianza",[5] si al momento de celebrarse el proceso el juzgador de los hechos no puede aquilatar adecuada y debidamente la evidencia debido a las constantes y prolongadas dilaciones habidas durante la celebración del proceso? ¿Por qué agravar más —con el pasar del tiempo— una situación que de por sí es extremadamente delicada y difícil?

A nuestra manera de ver las cosas, el perjuicio que sufre un acusado en esta clase de situaciones no sólo es obvio e incalculable sino que resulta insubsanable. Ello impide, en nuestra opinión, la aplicación rigurosa a casos como el presente de los criterios generalmente utilizados por los tribunales para evaluar si se ha violado o no el derecho a juicio rápido de un acusado durante la etapa pre-juicio.[6] En primer lugar, es indiscutible el hecho de que el transcurso del tiempo afecta la capacidad retentiva de los seres humanos. En segundo lugar, la pérdida por el juzgador de esa "óptima condición" para evaluar la prueba es algo que resulta irrecobrable. Por último, si ese juzgador, al momento de emitir su fallo, tenía o no "fresco" en su mente el testimonio que desfiló durante el proceso es una cuestión puramente subjetiva, la cual no es susceptible de ser demostrada en apelación. En otras palabras y en resumen, exigir de un apelante que nos demuestre que efectivamente el juzgador de los hechos no estaba, debido

---

[5] *Pueblo* v. *Arcelay Galán,* ante.

[6] Véase escolio 2, *ante.*

al transcurso del tiempo, en condiciones para aquilatar la prueba es exigirle un imposible.

Por las razones antes expresadas, somos del criterio que la norma general que debe ser establecida por este Tribunal en relación con esta clase de situaciones debe ser a los efectos de que una vez comienza el juicio, los tribunales de instancia no deben ni promover ni permitir que ocurran interrupciones durante el mismo, a no ser aquellas que resulten ser inevitables, [7] las cuales constituirán las únicas justificadas; [8] que la manifestación por parte del acusado, o su representación legal, al comienzo del juicio a los efectos de que está preparado constituye suficiente reclamo e invocación de su derecho a juicio rápido salvo, naturalmente, posterior renuncia a esos efectos, cf. Pueblo v. Santi Ortiz, 106 D.P.R. 67 (1977), [9] y que ocurrida la "dilación excesiva e irrazonable" en la celebración del proceso, [10] sin que ésta sea atribuible al acusado, éste queda exento de hacer una "demostración de perjuicio" ante el foro apelativo.

Estamos conscientes, no obstante lo anteriormente expresado, que existen casos que por su complejidad —los cuales conllevan la presentación en evidencia del testimonio de nu-

[7] Tales como los del receso normal para ingerir alimentos y al finalizar el día de trabajo y aquellos que, por enfermedad del magistrado, el acusado, de testigos indispensables o de los abogados de las partes, resulten necesarios. Ahora bien, de la tardanza ser, aun cuando justificada, una extremadamente prolongada debe considerarse, a solicitud del acusado, la conveniencia de la "terminación" del proceso y la celebración de un nuevo juicio.

[8] La concesión y duración de las cuales descansará en la sana discreción de los tribunales de instancia.

[9] Constituye una realidad el hecho de que en la práctica de la profesión resulta ser sumamente difícil e incómodo para un abogado postulante el tener que oponerse continuamente a esta clase de suspensiones, sobre todo cuando las mismas son a "sugerencia" del magistrado que preside el proceso.

[10] Por razón de que no existen dos casos cuyos hechos y circunstancias sean iguales, la determinación sobre si la dilación habida en la celebración del proceso ha sido una excesiva o irrazonable —causándose un perjuicio irremediable— será una que deberá hacerse caso a caso.

merosos testigos y abundante prueba documental o material—requieren inevitablemente que el proceso sea uno prolongado. En relación a estos casos, los señores jueces de instancia deberán ejercer un control efectivo con el propósito de que los mismos no se prolonguen más allá de lo absolutamente necesario. A esos efectos, y a manera de ejemplo, deberán celebrar reuniones pre-juicio conducentes a explorar al máximo la posibilidad de lograr estipulaciones respecto a aquella prueba que pueda ser objeto de ello. En adición, deberán evitar en todo lo posible discusiones estériles de los abogados entre sí y con el propio tribunal, así como toda otra clase de interrupciones innecesarias y superfluas. Igualmente, deberán establecer horarios de trabajo que permitan la conclusión del proceso en el tiempo menor posible.

## II

En el presente caso no hay duda de que la dilación habida, en la etapa del juicio, fue una excesiva e irrazonable, [11] sufriendo el apelante el consiguiente perjuicio. Las suspensiones y posposiciones que causaron la dilación ni fueron "justificadas" ni ocurrieron a solicitud del apelante. [12] Se infringió en su consecuencia, el derecho a juicio rápido que le garantiza la Constitución del Estado Libre Asociado de Puerto Rico a todo imputado de delito.

La opinión emitida por una mayoría de este Tribunal —no obstante reconocer expresamente que la dilación habida en el presente caso "fue excesiva y el récord no refleja satisfactoriamente la existencia o no de justa causa"— rechaza la contención del apelante de que se le violó su derecho a juicio rápido por el fundamento de que su "planteamiento es uno en

---

[11] Transcurrieron cuatro meses y trece días desde el comienzo del juicio hasta el día que se decretó la culpabilidad del apelante.

[12] Un examen de los autos revela que el apelante no tuvo *nada que ver* con, *por lo menos*, diez (10) de las dieciocho (18) suspensiones habidas.

abstracto y tardío" y por que éste no "ha podido demostrarnos perjuicio real y sustancial".

Dichos fundamentos resultan, cuando menos, contradictorios y desconcertantes por cuanto la opinión mayoritaria, para rechazar la contención del apelante, trae a colación unas citas de "estudiosos" de la "psicología moderna" con el propósito de refutar *en el abstracto* una realidad que es producto del sentido común; esto es, que el pasar del tiempo afecta el recuerdo de los seres humanos normales y corrientes.

Por otro lado, y como expresáramos anteriormente, exigir de un acusado convicto que nos demuestre en apelación que efectivamente el juzgador de los hechos no estaba, debido al transcurso del tiempo, en condición óptima para aquilatar la prueba desfilada, es exigirle un imposible. ([13])

Debe recordarse, por último, que la doctrina jurisprudencial a los efectos de que nos merece gran deferencia la adjudicación de credibilidad que realizan los jueces de instancia y de que no alteraremos la misma excepto en casos de pasión, prejuicio o parcialidad, *Pueblo* v. *López Pérez*, ante, está predicada precisamente en que ese juzgador estuvo en *posición óptima* para dirimirla. La decisión que emite hoy una mayoría de este Tribunal socava dicha norma.

Revocaría, en su consecuencia, la sentencia apelada y devolvería el caso al tribunal de instancia para la celebración de un nuevo juicio.

---

([13]) Por esas cosas del destino, en el presente caso se puede demostrar que ello sí ocurrió. Al dictar el fallo condenatorio, el juez de instancia declaró culpable y convicto al apelante de un cargo —relativo a la venta de un furgón— en relación con el cual la prueba de cargo había demostrado la legitimidad de dicha transacción. Señaládole dicho hecho, el tribunal procedió a reconsiderar y absolver al apelante de dicho cargo. Véase la minuta del 14 de marzo de 1984. Ello, a nuestra manera de ver las cosas, es prueba irrefutable de que el pasar del tiempo efectivamente afectó el recuerdo que de la prueba tenía el juez de instancia, quien es un ser humano normal.